# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| METRO STORAGE INTERNATIONAL LLC, METRO STORAGE LATAM LLC, MSI MANAGER LLC, LATAM MANAGER LLC, MATTHEW M. NAGEL, AS TRUSTEE OF THE MATTHEW M. NAGEL REVOCABLE TRUST DATED JULY 27, 2001, AS AMENDED, and K. BLAIR NAGEL, AS TRUSTEE OF THE K. BLAIR NAGEL REVOCABLE TRUST DATED JULY 30, 2003, AS AMENDED, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0937-JTL |
| JAMES A. HARRON, | ) ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: February 7, 2022
Date Decided: May 4, 2022

David C. McBride, Emily V. Burton, Lauren Dunkle Fortunato, M. Paige Valeski, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Harold C. Hirshman, Leah R. Bruno, Jacqueline A. Giannini, DENTONS US LLP, Chicago, Illinois; *Attorneys for Plaintiffs.*

E. Chaney Hall, Kasey H. DeSantis, FOX ROTHSCHILD LLP, Wilmington, Delaware; Jeffrey L. Widman, FOX ROTHSCHILD LLP, Chicago, Illinois; *Attorneys for Defendant.*

**LASTER, V.C**

Non-party Metro Storage LLC ("Metro US") is one of the largest privately held self-storage companies in the United States. In 2010, defendant James Harron approached the principals of Metro US, the brothers Blair and Matthew Nagel, about establishing a self-storage business in Brazil. In 2012, Harron and the Nagel brothers agreed to work together. To carry out the venture in Brazil (and potentially future ventures elsewhere), Harron and the Nagel brothers formed plaintiff Metro Storage International, LLC ("Metro International") and its wholly owned subsidiary, non-party Metro Storage Brazil, LLC ("Metro Brazil").

Harron served as President of Metro International, and he committed to devote his full time to that position. Harron had spent much of his career as an investment professional, initially with a firm and then for eighteen months on his own as an independent consultant. Harron and the Nagel brothers agreed that Harron would have six months to wrap up any existing engagements for other clients before devoting all of his time to Metro International.

Rather than wrapping up his other engagements, Harron continued working for his other principal client, Patrick A. Gouveia. During his tenure as the President of Metro International, Harron regularly provided consulting services to Gouveia and his associates and affiliates. Harron conceded that the services he provided to Gouveia were fundamentally the same services he was providing to Metro International as its President. To assist Gouveia, Harron disclosed confidential information belonging to Metro International and its affiliates. Harron knew what he was doing was wrong, but he did it anyway, and he kept his activities secret from the Nagel brothers.

Metro Brazil eventually began to struggle. Metro Brazil's principal equity investor started to string out its financial commitments. One of Harron's responsibilities was to find new capital, but nothing materialized. Unbeknownst to the Nagel brothers, Harron was working on sourcing capital for a cold-storage venture for Gouveia.

In 2017, Harron identified an opportunity to invest in an existing self-storage business in Central America. The Nagel brothers did not yet know about Harron's outside consulting, and they backed the new venture. To make the investment, they formed plaintiff Metro Storage LATAM LLC ("Metro LATAM," together with Metro International, the "Companies"). Harron became President of Metro LATAM.

By 2018, Metro Brazil was on the brink of failure. Metro International had not made any other investments, so it too was basically defunct. Metro LATAM had not performed as well as expected, but that investment appeared sound.

Harron decided to jump ship and begin working in the cold-storage business. When he left, he took confidential documents that belonged to the Companies.

After Harron left, the Nagel brothers discovered his extensive consulting for Gouveia. They caused the Companies and their affiliates to file this action against Harron.

The plaintiffs proved that Harron breached the duty of loyalty that he owed as President of the Companies. As a remedy, Harron will disgorge all of the outside consulting fees he received while working for the Companies. Harron also is liable for the attorneys' fees and expenses that the plaintiffs incurred pursuing the claim for breach of fiduciary duty.

The plaintiffs proved that Harron breached confidentiality restrictions in the Companies' governing agreements. The plaintiffs are entitled to a mandatory injunction requiring Harron to return all confidential information belonging to the Companies.

The plaintiffs proved that Metro International's managing member has the right to exercise an option to acquire Harron's interests in Metro International. The managing member will have thirty days from the entry of a final judgment in this action to exercise the option.

The plaintiffs proved that Metro LATAM's managing member validly exercised an option to acquire Harron's interests in Metro LATAM. Because of this litigation, the transaction did not close. The parties will complete the transaction using the exercise price calculated in this decision.

The plaintiffs proved that by breaching the confidentiality restrictions in the Companies' governing agreements, Harron caused the amount he borrowed under a note to become immediately due and payable. The final judgment will require Harron to pay the amount due in full satisfaction of the note.

The plaintiffs proved that Harron violated the Stored Communications Act. The Companies are entitled to statutory damages in the amount of $1,000, plus an award of attorneys' fees and costs for the amounts incurred litigating the claim under the Stored Communications Act.

## I.   FACTUAL BACKGROUND

Trial took place over two days using the zoom videoconferencing platform. The record is relatively concise. Three fact witnesses and four experts testified live. The parties

3

introduced 125 exhibits, including ten deposition transcripts. The court has evaluated the credibility of the witnesses and carefully weighed the evidence. The plaintiffs proved the following factual account by a preponderance of the evidence.[1]

## A.     Harron Approaches The Nagel Brothers.

In 2010, Harron became interested in the concept of creating a self-storage business in Brazil. At the time, Harron was working as an investment professional with Equity International, where he focused on "originating and sourcing and executing real estate-related investments, principally in emerging markets." Harron Tr. 93. Harron hired Hans Scholl, a resident of Brazil, to work as a consultant to evaluate the prospects of a Brazilian self-storage venture. *Id.*

In December 2010, Harron lost his job with Equity International. *Id.* at 99. After that, Harron worked for himself as an independent consultant.

In June 2011, a business contact introduced Harron to Matthew. Together, Matthew and his brother Blair co-own Metro US, which acquires, develops, and manages self-storage properties in the United States. Metro US is structured like a privately held real

---

[1] In the pretrial order, the parties agreed to fifty-five stipulations of fact. This decision relies on them when applicable. The stipulations do not address all of the factual issues, and they do not determine the inferences to be drawn from the stipulated facts when evaluated in conjunction with the evidence. Citations in the form "PTO ¶ —" refer to stipulated facts in the pretrial order. *See* Dkt. 117. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Only Matthew Nagel testified at trial, but to avoid confusion with his brother Blair Nagel, the decision cites his testimony as "Matthew Tr." Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit, with the page designated by the internal page number.

estate investment trust, and at the time of trial it owned 143 self-storage facilities. Matthew serves as Chairman of Metro US. Blair serves as the chief executive officer ("CEO"). *See* Matthew Tr. 184–86.

Matthew liked the idea of expanding internationally. Over the next year, Matthew and Harron spoke about opportunities for self-storage ventures in Latin America. Matthew came to understand through those discussions that Harron also had engagements for other clients.

Matthew and Harron agreed that Brazil would be their first target market. In February 2012, the Nagel brothers and Harron visited São Paulo to get a sense of the potential market. During that trip, the Nagel brothers met Scholl, who had continued to work with Harron on the potential for a Brazilian self-storage business. Their near-term goal was to identify a local Brazilian developer who could serve as a joint venture partner. *Id.* at 187–88.

In May 2012, the venture took a major step forward. Harron and the Nagel brothers executed a letter of intent with TRX Realty ("TRX"), a Brazilian real estate development company, to pursue the Brazilian self-storage venture. The plan was for TRX to provide both local development expertise and a source of local funding. Metro US would provide operational expertise and additional funding. *See* Harron Tr. 103; Matthew Tr. 189–90; JX 28 at 7–9.

With the international expansion getting ready to begin, the Nagel brothers formed Metro International as their vehicle for ventures outside of the United States. As a specific

entity to focus on Brazil, they created Metro Brazil. Metro International is the sole member of Metro Brazil.

Although the Nagel brothers controlled both Metro US and Metro International, neither entity had any ownership interest in the other. Metro International was not a subsidiary of Metro US, and Metro US was not a member of Metro International. Matthew Dep. 66–67. The entities were nevertheless affiliates given the Nagel brothers' common control of both. *See* JX 12 at 2–3. The Nagel brothers owned their member interests in Metro International through three trusts. Two of the trusts (the "Trusts") made loans to Harron to fund his capital contributions and are plaintiffs in this litigation.[2]

The signing of the letter of intent kicked off discussions about Harron's role. One option was for Harron to become a full-time employee, working exclusively for Metro US and its affiliates. Another option was for Harron to spend part of his time working for Metro US and its affiliates while continuing to work as a consultant for other clients.

Having been working on his own for eighteen months, Harron liked the security associated with full-time employment. The Nagel brothers favored that option because they wanted a full-time commitment. They believed that full-time employment was the only feasible alternative because Harron would be helping to build a self-storage business in

---

[2] The three trusts are (i) the Exempt Family Trust E/U the Matthew M. Nagel 2012 Family Trust, established October 2, 2012, (ii) the Matthew M. Nagel Revocable Trust established July 27, 2001, as amended, and (iii) the K. Blair Nagel Revocable Trust established July 30, 2003, as amended. The latter two trusts made the loans to Harron and are the "Trusts" for purposes of this decision.

Brazil from scratch with plans to expand in other markets in Latin America. Matthew told Harron that he did not think Harron could run Metro International while devoting time to other work. Harron Tr. 13; Matthew Tr. 191.

At the same time, the Nagel brothers understood that Harron had existing engagements with other clients. They agreed that Harron could have six months to wrap up his existing engagements, at which point he would be expected to work full time for Metro US and its affiliates. Matthew Tr. 196.

## B.     The Formal Agreements

To memorialize their business deal, the Nagel brothers and Harron entered into two agreements. The first was an employment agreement between Metro US and Harron. JX 13 (the "Employment Agreement" or "EA"). The second was the limited liability company agreement for Metro International. JX 12 (the "International Operating Agreement" or "IOA"). Both sides were represented by counsel, and they negotiated the agreements in tandem. *See* JX 5; Harron Tr. 11; Matthew Tr. 193.

The Employment Agreement was executed on October 10, 2012, but made effective as of May 24, 2012, to match the date of the letter of intent. The Employment Agreement described Harron's role as follows:

> During the Term, [Harron] shall act as Director of International Operations of [Metro US], President of [Metro International], President of [Metro Brazil], and as an officer of such other entities as shall be created by [Metro International] to pursue opportunities outside the United States (the "[Metro US] Subsidiaries") and shall have the usual and customary duties, responsibilities and authority of such positions in accordance with the operating agreements and by-laws of [Metro US], [Metro International], [Metro Brazil] and the other [Metro US] Subsidiaries, as the case may be.

7

EA § 3. The Employment Agreement required Harron to "perform his duties and responsibilities to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner." *Id.*

The Employment Agreement required Harron to "devote substantially all of his business time, attention and energies to his duties and employment hereunder." *Id.* § 4(a). The Employment Agreement expressly prohibited Harron from engaging "in any other business activity, whether or not such activity is pursued for gain, profit or other pecuniary advantage unless approved by the Chairman or . . . CEO of [Metro US]." *Id.* § 4(b). But the Employment Agreement permitted Harron to "continue to perform under and to wind up" any existing consulting engagement that began before the effective date of the agreement for a period of six months. *Id.* § 4(c).

Harron understood that he was obligated to wind up his existing consulting engagements by November 24, 2012. Harron Tr. 15. He also understood that he could not start any new engagements, and that he could not continue working as a consultant after November 24, unless he received specific approval from Matthew or Blair. *Id.* at 14, 16. Harron never sought or obtained approval from Matthew or Blair for any outside work. *Id.* at 16–17.

The Employment Agreement contained a confidentiality provision which provided that during Harron's employment and for two years after his departure, Harron could not disclose any confidential information "concerning the business, clients, organization, finances or affairs of [Metro US], any Subsidiary or any affiliate thereof for any reason or

8

purpose whatsoever other than in furtherance of [Harron's] work for [Metro US]." EA § 13(b).

The Employment Agreement also provided that Harron would receive equity compensation in the form of 20% of the Class A Units of Metro International and 10% of the Class B Units of Metro International. *Id.* § 6(a)–(b). In return, Harron was required to make an initial capital contribution to Metro International. *Id.* § 6(c).

The Employment Agreement provided that Harron could be terminated for "Cause" if he committed a "material breach." *Id.* § 8(b). The Employment Agreement noted that upon Harron's termination, Metro International could repurchase any vested units in Metro International. *Id.* § 12(e).

Consistent with the terms of the Employment Agreement, the International Operating Agreement admitted Harron as a member of the entity with 20% of the Class A Units and 10% of the Class B Units. The International Operating Agreement also contained a confidentiality provision that was substantially similar to the provision in the Employment Agreement (the "Confidentiality Provision"). This decision reproduces the text of the Confidentiality Provision as part of the Legal Analysis, *infra*.

As contemplated by the Employment Agreement, the International Operating Agreement identified Harron as President of the entity. Harron described his duties as President of Metro International as follows:

> My responsibilities as [P]resident of [Metro International] was to lead our international efforts, both from an investor perspective, much like I did for Brazil, trying to find and connect [Metro International] as the operating partner/investor with ideally local either capital or development partners. So my responsibility was to oversee the efforts that we had made, which

9

included Metro Brazil and later another, and also to explore other opportunities in consultation with Matt and Blair of interesting opportunities around the world.

Harron Tr. 22–23. Notably, Harron stressed his responsibility for setting up deals and finding new opportunities.

The plaintiffs' witnesses viewed Harron's duties as having a significant operational component. Matthew agreed that Harron was in charge of fundraising, but stressed that Harron was "the leader of [the] organization" and "in charge of all the day-to-day operations." Matthew Tr. 203. Harron was not only responsible for "finding new markets [and] business partners," but also for acting as "the conduit to bring our expertise from Metro [US]" into the international business. *Id.* The performance evaluations that Harron received from Matthew corroborate Matthew's understanding of Harron's duties. *See* JXs 119–21.

Another trial witness associated with Metro US and the Companies testified similarly to Matthew. Martin Gallagher was the President and Chief Operating Officer of Metro US and the Treasurer and Chief Operating Officer of Metro International. He stressed that Harron had responsibility for overseeing the Brazilian operation, maintaining the relationship with TRX, and serving as the connector between Metro US's expertise and the Brazilian venture. Gallagher Tr. 296, 300–01.

## C.    The Brazilian Venture Begins.

In August 2012, Metro Brazil and TRX officially formed their joint venture. Called MetroFit, the joint venture served as the operating entity for the self-storage business in Brazil. *See* Harron Tr. 29–30. TRX would provide MetroFit with its expertise in identifying

10

real estate opportunities and developing properties. Metro Brazil—through its affiliation with Metro US—would train the MetroFit staff and provide operational and marketing expertise. *Id.* at 30; Gallagher Tr. 300. Both TRX and the Nagel brothers would provide capital. *See* Harron Tr. 100. TRX expected to raise its share by creating an investment fund for high-net-worth Brazilian investors. *Id.* at 105.

TRX received a 70% interest in MetroFit, and Metro Brazil received a 30% interest. *Id.* at 101. MetroFit had its own board of managers and its own management team. Scholl was the CEO of MetroFit and had responsibility for "all aspects of MetroFit's activities, including operations, finance, real estate development, and sales and marketing." JX 28 at 118.

The MetroFit board of managers consisted of two representatives from TRX, two representatives from Metro Brazil, and Scholl. *See id.* at 120; Harron Tr. 108–09. Harron served as one of Metro Brazil's representatives, and he described himself as a co-founder of MetroFit. Harron understood that his job was to act as "the linchpin between the operational know-how of Metro [US] and what we were trying to create in Brazil." Harron Tr. 107. The Nagels expected that Harron would have a "hands-on" role at MetroFit. *See* Matthew Tr. 206.

MetroFit planned initially to develop self-storage facilities in and around São Paulo. Harron Tr. 105. One option was to build a new facility from the ground up. JX 37 at 13. Another option was to adapt "[u]nderutilized areas at existing retail stores" to realize "[s]ynergies with [r]etailers." *Id.* A third option was to "retrofit" existing structures. *Id.* MetroFit also envisioned acquiring self-storage facilities. JX 28 at 55.

11

Harron's rollout plan for MetroFit envisioned bringing online twenty self-storage facilities over a six-year period. *See* JX 8, "Rollout Plan" Tab. The plan anticipated identifying the site for the initial facility in the first three months, then identifying a site for an additional facility every two to three months after that. *Id.* Each facility would take approximately nineteen months before it could open and begin operations. *Id.* Each facility then would take approximately thirty months for its operations to mature and stabilize. *Id.* Each facility was projected to cost approximately 18 million Brazilian Reales (BRL). *Id.*, "Unit Model" Tab. Once stabilized at an occupancy rate of 85%, each facility was expected to generate 215,000 BRL in free cash flow per year. *Id.* The total cost to develop twenty facilities would be 360 million BRL, but once all twenty properties were stabilized, Harron estimated that the business would have an enterprise value of 587 million BRL. *Id.*, "Consolidated Model" Tab.

Over the long-term, MetroFit envisioned exit options for its investors. Those options could include a "[p]ublic listing (individual assets or platform), sale to a strategic (Brazilian), sale to a US/foreign strategic, or sale to a local or foreign private equity (PE) firm." JX 28 at 116.

Harron had played a major role in identifying TRX as a local partner and in setting up the joint venture. Going forward, Harron understood that his principal role in Brazil was to deliver operating expertise and connect the venture with personnel from Metro US. JX 122 at 1. At the end of 2012, the first year of MetroFit's operations, Matthew advised Harron that he had "done a decent job in this area," but that "it is also one in which I think you need the most improvement." *Id.* Matthew believed that MetroFit was already falling

12

behind in its operational goals, and he wanted Harron to make supporting the MetroFit store-level operations his "top priority." *Id.* at 3. As Matthew saw matters, "The most important area to make work is our construction and operational experience delivered to our Brazil market. Nothing should take away from that focus." *Id.*

What the Nagel brothers did not know was that Harron had not complied with the commitment he made not to start any new consulting engagements for other parties after May 24, 2012, and to wrap up any consulting engagements by November 24, 2012. When Harron made his commitment to devote his full time and effort to Metro International, his other principal client was Gouveia. Harron Tr. 36, 145. Harron felt considerable loyalty to Gouveia because he had engaged Harron as a consultant and given him an opportunity to earn income after he lost his job with Equity International. *Id.* at 145.

Harron did not want to stop working for Gouveia just because he had agreed to work for the Nagel brothers. *Id.* After reaching an understanding with the Nagel brothers but before formally signing the Employment Agreement, Harron told Gouveia that he would "ideally like to be able to dedicate [his] time to both" the Nagel brothers and Gouveia. JX 7 at 1.

Consistent with that desire, Harron entered into a consulting agreement with Gouveia's principal business entity, Spire Group Ltd. ("Spire"), that was dated August 10, 2012, three months *after* the date when Harron agreed not to take on any new engagements. JX 9 (the "Tremont Engagement") at 1. In that engagement, Harron agreed to "provide guidance and direction on a financing strategy for Tremont Street Apartments in Catalina Island, CA." *Id.* at 5; *see* Harron Tr. 96. Harron's specific tasks included:

- Identify and vet financial institutions (banks, specialty finance companies, CMBS lenders, etc.) that might have an interest in making a loan to the property.

- Coordinate data exchange on the property between Tremont and selected financial institutions.

- Advise Tremont on the appropriate structuring and documentation of prospective debt financing.

- Participate in meeting and activities as requested by Tremont.

- Travel as required by Tremont.

JX 9 at 5. Spire agreed to pay Harron a total of $35,000 for what was anticipated to be a three-month engagement. *Id.*

In addition to the Tremont Engagement, Harron had entered into a broader consulting agreement with Spire, dated February 21, 2012, under which he agreed to help Spire expand its core business internationally. Spire was engaged in the design, construction, and operation of cold-storage warehouses. JX 1 (the "Cold-Storage Engagement"). The agreement contemplated a one-year engagement, and so it extended beyond the November 2012 deadline for Harron to wrap up his other projects.

The scope of services that Harron agreed to provide to Spire under the Cold-Storage Engagement was quite broad:

> Depending on Spire's specific investment priorities and needs, [Harron] shall provide guidance and direction on an overall international expansion plan for Spire, analyzing how the Company's core competency—the design, construction and operation of temperature-controlled warehousing—can be applied to other markets outside the US and Canada. Spire and [Harron] acknowledge that the initial markets under consideration will be India and Bangladesh. However, other markets may be added/analyzed—as appropriate—during the Term of the Agreement.

*Id.* at 5.

Harron's specific tasks for the Cold-Storage Engagement included:

- Identify and vet local, in-market development companies that are eager to partner with Spire on the creation of an integrated, temperature-controlled public warehousing company ("Venture").

- Advise Spire on the appropriate structuring and documentation of the establishment and ongoing operation of Venture.

- Advise Spire and Venture on capital sources – equity and debt – that may wish to invest capital into, or alongside, the Venture. Spire and Consultant acknowledge that Spire and/or Venture will enter into an appropriate compensation arrangement with [Harron] – separate from this Agreement – that would define the terms, conditions, and payment parameters guiding [Harron's] work in that regard.

- Participate in meeting and activities as requested by Spire.

- Travel as required by Spire.

*Id.* at 5. Spire acknowledged that "[Harron] will be eligible and expected to participate as an equity owner in any and all Ventures that [Harron] and Spire evaluate." *Id.* Spire agreed to pay Harron a retainer of $10,000 per month. *Id.* Harron agreed that when not traveling, Spire could require that he work out of Spire's offices in Toronto. *Id.* As part of his dues for Spire, Harron received a Spire email address. JX 2.

As Harron admitted at trial, the work that Harron committed to perform under the Cold-Storage Engagement for Spire was precisely the same work he was supposed to be doing as President of Metro International. Harron Tr. 42. Under the Cold-Storage Engagement, Harron committed to help Spire take its existing cold-storage business model and expand internationally, initially through a start-up operation in India or Bangladesh. In return, Harron would receive base compensation plus a future equity stake. JX 1 at 5. At Metro International, Harron committed to help Metro US take its existing self-storage

15

business model and expand internationally, initially through a start-up operation in Brazil. In exchange, he received somewhat greater base compensation plus an equity stake.

Ironically, after accepting the job with the Nagel brothers, Harron emailed Gouveia to discuss "the status of [the] Brazilian self storage business and how [he saw] that venture playing out." JX 7 at 1. He specifically wanted to discuss "how it might impact the time [he] can dedicate to [Gouveia] and the cold storage business going forward." *Id.* Rather than worrying about how his work for Gouveia would affect his work for the Nagel brothers, Harron was worried about how his work for the Nagel brothers would affect his work for Gouveia.

**D.    MetroFit in 2013**

In 2013, MetroFit completed its first full year of operations. Harron's review for the year evidenced a growing disconnect between the parts of his job where he acted like an investment professional and the parts of his job that involved operations. Harron was comfortable in the first area and performed well. He did not take naturally to the second area, and he was not making the effort to learn. In the second area, he did not perform well.

Harron identified his principal successes for the year as involving "priming the pump" on new sources of financing, which inured to the benefit of one of Metro US's operations in the United States. JX 121 at 1. The Nagel brothers commended his effort, but "didn't realize [that Harron had] spent a lot of time doing this." *Id.* Harron also spent time looking for other international opportunities in Russia, the Middle East, Mexico, and Guatemala. *Id.* The Nagel brothers cautioned Harron against looking for new deals and advised that "[k]nocking it out of the park with MetroFit in Brazil will be the fastest route

16

to reaching this goal." *Id.* They told Harron that it was "critical to remain focused on making Brazil a success before committing to another market/partner." *Id.*

The Nagel brothers wanted Harron to focus more on MetroFit and to "[p]rioritize MetroFit['s] operational initiatives." *Id.* at 2. They noted that Harron "landed far short" in his efforts to establish reporting systems for MetroFit and that as a result, Metro US did "not have the firm view on the business that [it] should." *Id.* at 1. They rated the lack of financial reporting as a "big disappointment." *Id.* at 2.

The Nagel brothers gave Harron a list of specific operational tasks that included creating an organizational chart for MetroFit, providing a comprehensive contact list for MetroFit, identifying its bank account, assembling all relevant legal documents, creating financial statements, and otherwise getting MetroFit's operational "house in order." *Id.* at 3. The Nagel brothers wanted Harron to visit Brazil at least four times and to close on an additional four to ten site locations in 2014. *Id.* at 4.

What the Nagel brothers did not know was that Harron had continued to provide consulting services to Gouveia during 2013. Harron was working formally on three major projects for Gouveia: (i) the Cold-Storage Engagement, (ii) the Tremont Engagement, and (iii) the negotiation of a lease extension on a cold-storage warehouse that Spire owned in Green Bay (the "Green Bay Lease Engagement"). *See* JX 15 at 1. Harron also was advising Gouveia informally on five different opportunities to acquire cold-storage facilities in the United States. *Id.* at 2.

In June 2013, Harron sent a bill to Spire for $50,000, identifying the fee as

17

Payment for the arrangement of successful debt financing of Tremont Street Apartments (Catalina Island, CA) entered into by Red Capital Management. Loan value in the amount of US$ 3,600,000.

*See, e.g.*, JX 108 at JH_ESI '718.

In August 2013, Harron proposed rolling all of his engagements for Spire into a single, overarching engagement. JX 17. Rather than winding down his involvement with Gouveia, Harron sought to broaden it: "Bottom line, Pat – I love working with you and want to continue to offer my services, contacts, skills, etc. to help you grow your business (and make you some $$$ along the way)." *Id.*; *see also* JX 18.

## E.      MetroFit in 2014

In February 2014, MetroFit opened its first self-storage facility. JX 28 at 46. As 2014 continued to unfold, the Brazilian economy entered a recession, but that was not seen as a problem for MetroFit. All of the witnesses agreed that the self-storage industry is resilient and weathers recessions very well. Matthew Tr. 231–32; *accord* Harron Tr. 165–67; Gallagher Tr. 324; *see* JX 28 at 18–20.

At the end of 2014, the Nagel brothers commented in Harron's annual review that Harron had helped "buil[d] something unique in the self storage world" and that they were "proud of what has been accomplished." JX 120 at 1. They believed MetroFit already had become "a leading brand in Brazil, with prospects for growth that could make it the largest in Brazil within the next 18 months." *Id.* at 1.

At the same time, the Nagel brothers noted that Harron was underperforming on the operational side. They told Harron that his "ambition needs to be tempered with the reality of what is on your plate and what the true goals are." *Id.* To that end, they told Harron that

18

"[s]topping to take the time to think plans through, strategize the steps needed and related time to accomplish short-term goals and objectives should help you manage your time and other peoples' time more efficiently." *Id.*

The Nagel brothers also were clear that despite raising this issue in his previous annual review, Harron still was not visiting Brazil enough: "[Y]ou really need to visit Brazil more often, <u>at least</u> once per quarter for a full week at a time," and that "[p]robably 6 times per year should be the target." *Id.* The Nagel brothers told Harron that this was "the best way to advance the Metro [US] 'value-add' model and clear up issues." *Id.*

Basic operational problems carried over from the previous year. The Nagel brothers had made clear that Harron needed to establish good financial reporting systems, yet one of their major criticisms of Harron for 2014 was "[n]ot paying attention to financial reporting for [Metro International], MetroFit, or the [entities for each location]." *Id.* They gave him specific goals for the first quarter of 2015 that included for each month, "meet the deadline this month for accurate and understandable financial reports issuance for [Metro International] and MetroFit." *Id.*

The Nagel brothers' bottom line message was that Harron was a "real pro" and "the perfect representative for [Metro International]." *Id.* at 2. They also bluntly told him, "Your weakness is in planning and running the operational side of [Metro International]." *Id.* One of the issues that Harron needed to address was his "lack of demanding accountability from MetroFit/[Scholl] in areas such as financial reporting, system development, [and] human re[s]our[c]e management." *Id.*

19

What the Nagel brothers did not know was that Harron was still providing an extensive array of consulting services to Spire. Harron was still working for Gouveia on the Green Bay Lease Engagement. *See* JX 21. In addition, in March 2014, Harron entered into a new consulting agreement with Gouveia to provide services to Black Rose Tremont, Inc., a Spire affiliate. JX 22 (the "Black Rose Engagement"). Under the agreement, Harron agreed to "provide guidance and direction on a strategy designed to increase Black Rose and its related companies business opportunities in international/foreign markets via partnerships, joint ventures, potential acquisitions, etc." *Id.* at 5. Harron also agreed to "be responsible for developing a financing strategy for various Black Rose and its related companies real estate needs, including owned property and or leased property," with the financing strategy including "debt and/or equity financing alternatives." *Id.*

Harron's specific tasks included:

- Identify and prioritize prospective international markets that offer promise from a real estate and cold storage facility perspective.

- Find prospective foreign partners that are i) interested in cold storage development within their market, and ii) willing to partner with Black Rose on prospective partnerships and/or joint ventures.

- Negotiate the relevant terms of business partnerships between Black Rose and prospective investors, including comprehensive legal documents governing those prospective partnerships (either domestically or internationally).

- Identify and vet financial institutions (banks, specialty finance companies, CMBS lenders, etc.) that might have an interest in making a loan or investment into Black Rose's real estate assets.

- Coordinate data exchange on the real estate assets between Black Rose and selected financial institutions.

20

- Advise Black Rose on the appropriate structuring and documentation of prospective debt and/or equity financing.

- Participate in meetings and activities as requested by Black Rose.

- Travel as required by Black Rose.

*Id.* at 5. Spire agreed to pay Harron a monthly retainer of $5,000 for what was expected to be a six-month engagement, with the retainer credited against the fee that Harron expected to earn for a successful financing. *Id.* Harron agreed that "[w]hen not traveling," he would work at Black Rose's request at its offices in Toronto, Canada. *Id.*

At trial, Harron admitted that the work for the Black Rose Engagement was precisely the same work he had committed to perform for Metro International. Harron Tr. 44. He conceded that the only difference was that the Black Rose Engagement used the words "cold storage" rather than "self-storage." *Id.*

## F. MetroFit in 2015

By March 2015 MetroFit had opened a second facility. MetroFit had a third facility that was scheduled to open, and a fourth facility that was "[d]evelopment-ready" with "approvals in place." JX 28 at 46. At this point, MetroFit was projecting that it had the "[s]tructure in place for 8–10 new stores developed/year." *Id.* MetroFit was also projecting a need for "BRL 180–250 [million] in annual capital." *Id.*

Up to that point, the Nagel brothers and TRX Realty had provided the funding for the business. The Nagel brothers had invested $2 million, and they had gone four years without any return of capital. *See* JX 119 at 1; *see also* JX 120 at 2. A major initiative for the latter half of 2015 was to find an external source of growth capital. *See* JX 119 at 2

21

("Brazil Investor – working all angles to find a capital partner . . . ."); JX 25 (September 2015 confidentiality agreement between Metro International and Goldman Sachs & Co. ("Goldman")). Harron led that effort. Harron Tr. 68. Scholl and the local MetroFit team also played a major role. *See, e.g.*, JX 20.

Harron's review for 2015 continued to evidence his struggles with the operational side of the business. The Nagel brothers wanted Harron to "[s]mooth over tensions and frustrations with home office staff working with [Metro International] initiatives in all countries." JX 119 at 1. They also reiterated that "[p]roper papering of all resolutions and legal and accounting management is key for all ventures." *Id.*

Even though the Brazil operation was still in its formative years, Harron continued to think in terms of big new deals. Harron's personal goals for 2016 included "expand beyond Brazil." JX 119 at 2.

Unbeknownst to the Nagel brothers, Harron was continuing to provide consulting services to Spire. During 2015, he completed a refinancing of a property that had been the subject of the Green Bay Lease Engagement. *See* JX 24; JX 108 at JH_ESI '873–74. Harron calculated that Spire owed him $159,750 for securing a successful refinancing in the amount of $10,650,000. *See* JX 108 at JH_ESI '919. Gouveia agreed to pay $157,500. *See id.* at JH_ESI '937, '874. To give Gouveia insight into the economics of the deal, Harron compared its terms with the financing offers that MetroFit was getting. *See* JX 27.

Separately, Harron calculated that Spire owed him a fee of $75,000 for assisting in the sale of a property that a Spire-affiliate owned, less retainer payments of $15,000 that Harron had received. *See* JX 108 at JH_ESI '937, '874. Gouveia viewed that as part of a

22

longer term engagement and continued paying Harron a retainer of $5,000 per month. *See id.* at JH_ESI '185, '239.

## G.     MetroFit in 2016

In early 2016, MetroFit still had only three properties in its portfolio. Two were complete, and the third was under construction. *See* JX 37 at 10. The two completed facilities were 69% and 34% occupied. *Id.* The existing stores were not performing well, and their operations had "sort of flatlined." Gallagher Tr. 322.

Harron's principal achievement in 2016 was to secure the growth capital that MetroFit needed. Harron Tr. 68. After a lengthy negotiation, Harron inked a deal with Goldman on a three-year investment totaling 600 million BRL. JX 37 at 12. Starting in 2017, Goldman would invest 200 million BRL into the development of self-storage properties and receive 20% of MetroFit. *Id.* In 2018, Goldman would invest another 200 million BRL into the development of self-storage properties and receive an additional 15% of MetroFit. *Id.* In 2019, Goldman would invest another 200 million BRL into the development of self-storage properties and receive an additional 15% of MetroFit, bringing its total ownership to 50%. *Id.* The transaction valued MetroFit at $10 million. Harron Tr. 106.

With capital secured, MetroFit set a goal of developing five new facilities in 2017, three in São Paulo and two in Rio de Janeiro. JX 37 at 26. MetroFit also had a goal of increasing occupancy rates in its existing facilities. *Id.* at 66.

During 2016, Harron also began assessing a potential investment into Mr. Bodeguitas, a Central American self-storage operator. Investing in Mr. Bodeguitas was a

different type of deal than MetroFit. The latter was a ground-up startup. Mr. Bodeguitas was a "well-run operating company," and the primary purpose of Metro International making an equity investment was to finance Mr. Bodeguitas' expansion. Gallagher Tr. 319–20; *see* JX 41 at 9; Harron Tr. 28, 111.

Unbeknownst to the Nagel brothers, Harron continued to provide consulting services to Spire during 2016. In February, Harron sent Black Rose an invoice for $69,475. JX 108 at JH '555. He described the services rendered as:

- Potential sale of the Catalina property

- Discussions with the Santa Catalina Island Company pertaining to the land lease of the property and possible sale.

- Negotiations with Hampstead Company for the acquisition of the Catalina property.

- Negotiations with Safran Company Limited for the sale of the Catalina property.

*Id.* Harron continued to receive a retainer of $5,000 per month from Spire. *See, e.g.*, *id.* at JH_ESI '609.

Harron also worked on other projects for Gouveia. See JXs 31–34. At times, Harron used his position at Metro International to open doors for Gouveia. *See* JX 33.

## H.     MetroFit in 2017

In 2017, MetroFit still had only three properties in its portfolio. *See* Harron Tr. 31. As the Brazilian recession worsened, Goldman became worried and sought to reduce its risk by stretching out the timeline for making its investment. *Id.* at 109–10, 168. The Nagel brothers tasked Harron and Scholl with finding a new investor that could either buy out Goldman or reduce Goldman's exposure. *See* Matthew Tr. 208; Gallagher Tr. 312, 322.

24

Harron and Scholl seemed to be making efforts, but nothing ever materialized. Gallagher Tr. 302, 312.

As he had in 2016, and still unbeknownst to the Nagel brothers, Harron was also providing consulting services to Gouveia. *See, e.g.*, JX 108 at JH_ESI '569. During 2017, Harron devoted substantial time to the Cold-Storage Engagement. *See* JX 42. He developed a relationship with Jeff Kirby, the representative of a family office for a high-net worth investor. Harron Tr. 159. Harron then assisted Gouveia in negotiating a term sheet with Kirby for a $10 million equity investment by New Sparta Asset Management Ltd. ("New Sparta") in Gouveia's cold-storage business. *See id.* at 56. When Kirby proposed a structure for the investment, Harron told Gouveia that it was "basically [Metro International's] deal with Goldman in Brazil." JX 43. Harron then used his knowledge of Metro International's deal to suggest changes and negotiating strategies to Gouveia. *See id.*; *see also* JX 44; JX 48; JX 53.

At one point in the discussions, Harron provided Gouveia and another partner with the structure of Metro International's "self storage OpCo / PropCo structure with Goldman Sachs in Brazil." JX 48 at 1. Recognizing that he was providing confidential information, Harron asked them to "Pls keep this confidential." *Id.* At trial, Harron admitted that the structure was confidential. Harron Tr. 70. He admitted that it took extensive time to create, negotiate, and work through the details of the structure for Metro International. *Id.* at 69. He also admitted that he gave the structure to Gouveia and his colleague to help them with a deal that had nothing to do with Metro International or its affiliates. *Id.* at 67.

25

Harron prepared a detailed markup of Kirby's term sheet. *See* JX 44B. He also attended a three day negotiation and strategy session in Canada in October 2017. *See* JX 50. Harron did not tell the Nagel brothers or anyone at Metro US or the Companies about what he was doing. Harron Tr. 55.

## I.     The Creation Of Metro LATAM

Another event that took place in 2017 was the creation of Metro LATAM and the investment in Mr. Bodeguitas. By email dated March 30, 2017, Harron formally recommended that the Nagel brothers make a $4 million investment in Mr. Bodeguitas. JX 41 at 1. As the vehicle for that investment, the Nagel brothers and Harron created Metro LATAM.

The structure of Metro LATAM largely paralleled Metro International. Likewise, the operating agreement for Metro LATAM generally contained provisions that tracked the International Operating Agreement, including a provision appointing Harron as President and a version of the Confidentiality Provision. *See* JX 40 (the "LATAM Operating Agreement" or "LOA"). Through their trusts, the Nagel brothers owned 90% of Metro LATAM, and Harron owned the remaining 10%. Harron served as President of Metro LATAM.

## J.     Harron Resigns.

In 2018, MetroFit still had only three properties in its portfolio. *See* Harron Tr. 31. Goldman did not want to commit more capital, so MetroFit planned to focus on "ONLY the operational things that the company can control—primarily lease-up (occupancy), bad debt, and, to a lesser extent, effective rents." JX 118 at 3–4. MetroFit planned to "live under

26

a 2018 Budget that assumes NO MORE Goldman land site purchases, and quantity operational shortfalls required to be funded throughout [the] year." *Id.* at 4.

On August 13, 2018, Harron notified Metro US that he was resigning from all of his positions with Metro US and its affiliates, effective September 11, 2018. PTO ¶ 32. Harron's resignation came out of the blue. Matthew was surprised. Matthew Tr. 284. Gallagher was shocked. Gallagher Tr. 344.

On September 11, 2018, Harron left to take a position with Americold Realty Trust, a company operating in the cold-storage business. Harron Tr. 88. Harron had learned about the cold-storage business by providing consulting services to Gouveia.

As he had in 2016 and 2017, and still unbeknownst to the Nagel brothers, Harron continued to provide consulting services to Gouveia until he left Metro US and its affiliates in September 2018. *See, e.g.*, JX 108 at JH_ESI '266. Harron even started a new project for Spire in spring 2018 that involved evaluating a cold-storage investment in Kenya. *See* JX 54; Harron Tr. 45–46.

In June 2018, Harron billed Spire for $131,250 for his work for Kool Solutions India Ltd., the Spire affiliate formed to pursue international expansion in India. Harron described the services he provided as "[d]iscussions, consultations and negotiations with an international private equity fund manager related to the successful investment of growth capital into Kool Solutions India Ltd." *See* JX 108 at JH_ESI '911–12.

With Harron gone, Gallagher took over as President of Metro International. Gallagher Tr. 343–44. The responsibility for working with MetroFit fell primarily on Gallagher and Matthew. Matthew Tr. 216. The Brazilian joint venture was facing many

27

issues. It was not growing, and Goldman was trying to avoid funding any new developments. MetroFit's employees were getting nervous about the future of the company and starting to leave. With the benefit of hindsight, Matthew attributed these issues to Harron's failure to be sufficiently involved with the business to identify and address these issues. *Id.* at 216–17.

## K. Metro US Discovers Harron's Outside Consulting.

Metro US has a policy that after an employee leaves, the employee's supervisor receives copies of emails addressed to that employee's company email address. *Id.* at 219. The sender then receives an automated reply notifying them that the employee no longer works at Metro US. *Id.* at 220. This procedure ensures that the "supervisor can follow up on anything that needs to be done to carry on the business." *Id.* at 219.

As Harron's supervisor, Matthew received copies of emails addressed to Harron. He immediately began seeing emails from "people that [he had] never heard of." *Id.* at 220. Matthew looked through his contacts and old emails to determine whether he was supposed to know who the people were, but he found nothing.

One of the emails referenced a memorandum that discussed a project for Spire. Matthew looked at the memorandum and learned that Harron had been assisting Spire on the Cold-Storage Engagement. Matthew looked for other emails referencing Spire's projects. His efforts led him to look in the "deleted emails" folder, which contained "some crazy number, like 11,000 or 13,000" emails. *Id.* at 221. The deleted emails revealed the extent of Harron's work on other engagements. Matthew was "absolutely shocked, just

28

gut-punched." *Id.*; *see also id.* at 227 (describing the quantity and content of the emails as "mind-numbing and boggling").

To better understand the situation, Matthew contacted Scott Nemes, Metro US's Director of Information Technology. Matthew asked Nemes whether he had retrieved Metro US's company owned technology after Harron's departure, consistent with the Metro US policy. Nemes reported that he had met with Harron on September 13, 2018, to retrieve his company computers and phone. Before the meeting, Nemes had reminded Harron to bring his company computers and phone. JX 71. During the meeting, Harron turned in a Microsoft Surface laptop (the "Surface") and a cellphone. Harron Dep. 242–45. Harron did not return a Dell laptop (the "Dell") that he knew he possessed and was obligated to turn in. Harron Tr. 76. Nemes did not know about the Dell and had not asked for it. Harron did not return the Dell until February 2020, after the filing of this litigation. PTO ¶ 68.

In response to Matthew's call, Nemes gave Matthew the Surface. On the advice of counsel, Matthew turned over the Surface to Protek International, Inc. ("Protek"), a computer forensics firm. Protek analyzed the Surface and obtained Harron's unfiltered email from Metro US's server.

Protek prepared a forensic report which indicates that Harron placed ten documents in the Surface's recycle bin between August 1 and August 12, 2018, then another 262 documents in the Surface's recycle bin between August 13 and September 12. He placed eleven documents in the Surface's recycle bin on September 13. PTO ¶ 72; JX 109 at 5. The final deletions occurred two days after Harron's final day at Metro, just before Harron

gave Nemes the Surface. The documents include materials related to Harron's outside consultant work. *See* JX 109 at 5. Protek could not rule out the possibility that Harron had transferred the deleted items to a USB drive, attached them to an email, or uploaded them to a file share system before their deletion. *Id.* at 6. Protek identified 972 emails in Harron's deleted items folder that related to Harron's consulting work. *Id.*

Protek also determined that Harron had inserted three USB drives into the Surface before turning it in. He inserted the first USB drive on August 27, 2018, for approximately two hours. He inserted a second USB drive on August 30, 2018, for nearly twenty-three hours. He inserted a third USB drive on September 13, 2018, two days after his resignation was effective, for approximately seventy-five minutes. *Id.* at 7.

Harron testified that he has "no reason to dispute" the forensic report. Harron Tr. 79. Harron eventually produced the first two USB drives, but he claims to have lost the third. PTO ¶¶ 70–71. Harron's testimony regarding the third USB drive meandered from denial to non-recollection to semi-acknowledgement.[3] He now "doesn't not recall" the third USB drive. Harron Tr. 161 (cleaned up).

---

[3] On October 31, 2019, Harron represented that he had "two flash drives that contain documents he copied from the Surface." Dkt. 98 Ex. F, First Set of Interrogatories ¶ 5. After Protek concluded that three USB drives had been inserted into the Surface, the plaintiffs moved to compel production of forensic images of all three USB devices. On May 27, 2020, and in opposition to plaintiffs' motion to compel, Harron represented that the third USB drive was "news to [Harron] and his counsel" and that Harron "does not recall a third USB drive." Dkt. 52 ¶ 16. Harron swore to the accuracy of that representation. *Id.* Affidavit ¶ 12 ("I do not recall plugging a third, different USB drive into the Metro-issued laptop."). On June 22, 2020, Harron again represented that he "d[id] not recall ever possessing or using the [third] USB device." Dkt. 98 Ex. I, First Set of Interrogatories ¶ 3. During his deposition on August 26, 2020, Harron changed course. At that point, he

The forensic report also analyzed the "jump list records on the Surface." JX 109 at 8. Those records show when Harron accessed Metro US's network. Generally speaking, Harron accessed the network at times corresponding to his insertion of the USB drives in the Surface. *Id.*

## L.    This Litigation

On December 26, 2018, the Companies, their managing members, and the Trusts filed this action against Harron. *See* Dkt. 1 (the "Complaint" or "Compl.").

- Count I asserted that Harron breached the International Operating Agreement by sharing "Confidential Information for a purpose inconsistent with [Metro International's] benefit." *Id.* ¶¶ 80–86.

- Count II asserted that Harron breached the LATAM Operating Agreement by sharing "Confidential Information for a purpose inconsistent with Metro LATAM's benefit." *Id.* ¶¶ 87–93.

- Count III asserted that Harron breached the fiduciary duty of loyalty that he owed to the Companies. *Id.* ¶¶ 94–100.

- Count IV asserted that Harron violated the Stored Communications Act, 18 U.S.C. § 2701, by accessing Metro US's network without authorization and downloading documents. *Id.* ¶¶ 101–06.

---

admitted that he was "offloading documents on to a USB drive on [August 27, August 30, and September 13] as reflected in" the report. Harron Dep. 256. Moments later, Harron backtracked and said that he did not "remember plugging [the third USB drive] in or offloading documents." *Id.* at 258. At trial on May 26, 2021, Harron initially testified that "based on expert testimony," he "believe[d]" that he inserted a third USB drive, but that he did not "recall it." Harron Tr. 79. Later that morning, in response to a question from his attorney, Harron stated that "I don't not recall [the third USB drive]. I just don't have the third USB drive." *Id.* at 161. His attorney, understandably confused, asked Harron "to help [him] with that one." *Id.* Harron explained that he "very well could have used a third USB drive. [He] just ha[s] not been able to locate it." *Id.*

31

- Count V requested a declaratory judgment that Metro International, through its managing member, could "repurchase Harron's Units . . . at no cost." *Id.* ¶¶ 107–12.

- Count VI originally requested a declaratory judgment that Metro LATAM, through its managing member, could "repurchase Harron's Units . . . at no cost." *Id.* ¶¶ 113–18. The plaintiffs currently seek a declaratory judgment that the managing member of Metro LATAM can repurchase the units at 20% of their appraised value. Dkt. 128 ("POB") at 41.

- Count VII requests a declaratory judgment that a note Harron executed is "immediately due and payable." Compl. ¶¶ 119–23; *see* POB at 44–45.

On February 25, 2019, Harron moved to dismiss the Complaint for either (1) lack of personal jurisdiction or (2) in favor of arbitration. Dkt. 10 at 2. On July 19, 2019, this court issued a memorandum opinion denying Harron's motion to dismiss for lack of personal jurisdiction. Dkt. 25. That same day, this court issued an order denying Harron's motion to dismiss in favor of arbitration. Dkt 26.

During discovery, the plaintiffs obtained an order forcing Harron to produce documents from the first two USB drives that he attached to the Surface. *See* Dkt. 58. The USB drives contained many confidential documents that were proprietary to Metro US and its affiliates. *See* Harron Tr. 80; Harron Dep. 267.

When asked why he took those documents, Harron responded that he felt he "was entitled to do [so], obviously, confidentiality issues notwithstanding." Harron Tr. 90. Demonstrating his skill at crafting self-serving justifications, Harron claimed to have regarded the documents as "artifacts . . . that [he] was particularly proud of," which he could keep as souvenirs. *Id.*

In February 2020, Harron finally produced his Dell laptop. After conducting a forensic analysis, Protek determined that Harron placed 268 documents into the Dell's recycle bin on September 4, 2018. PTO ¶ 73; JX 109 at 9; JX 110 Ex. 9 (listing the documents). Protek could not rule out the possibility that the deleted items were transferred to a USB drive, attached to an email, or uploaded to a file share system. JX 109 at 9. Protek identified 700 emails in Harron's Outlook email account on the Dell. *Id.*

Protek's forensic analysis showed that on September 13, 2018—the day Harron met with Nemes—there had been a "syncing" event between the Dell and a folder named "Dropbox." *Id.* at 10; *see* JX 110 Ex. 11. The synced files primarily related to Harron's work at MetroFit. *See* JX 110, Ex. 11 at 417. Protek could not determine whether the syncing involved files being uploaded or downloaded, but it seemed likely that files were downloaded from the cloud and first appeared on the Dell on September 13.

## M.    The Current State Of Metro International And Metro LATAM

In early 2019, Metro Brazil transferred control over MetroFit to Goldman, which pursued an orderly liquidation of the business. Gallagher Tr. 322. Goldman sold the operating self-storage facilities and two of three land parcels. *Id.* MetroFit has been using the sales to fund the costs of winding down its operations. Matthew Dep. 94–95. It will likely take until the end of 2022 to complete the liquidation. By all accounts, MetroFit has been a failure. Gallagher Tr. 350. So far, Metro International has received approximately $140,000 from the dissolution of MetroFit. *See* JX 107 at 16. Metro International anticipates that any further distributions will be minimal and that all of the amounts will be used to pay Metro International's creditors. Gallagher Tr. 350.

33

The plaintiffs did not present evidence sufficient to provide meaningful insight into the current state of affairs at Metro LATAM. At trial, Gallagher described the performance of Mr. Bodeguitas as "a bit . . . sluggish." *Id.* at 327. But he also cited the business as "an example of self-storage's resilience in South America." *Id.* at 352–53.

## II.    LEGAL ANALYSIS

The plaintiffs asserted an array of claims against Harron. The plaintiffs treated each claim as if each of the plaintiffs asserted it, even though only certain plaintiffs can assert certain claims. Harron did not take issue with this approach.

This decision starts with the plaintiffs' most expansive claim, and the one they contend supports the greatest quantum of damages. That claim asserts that Harron breached his fiduciary duties as an officer of the Companies. Because that claim belongs to the Companies, they are the natural plaintiffs and are the recipients of the remedy.

The plaintiffs proved that Harron breached the duty of loyalty that he owed to the Companies as their President. As a remedy, Harron will disgorge all of the fees he received for the outside consulting that he engaged in while working for the Companies. Harron also is liable for the attorneys' fees and expenses that the plaintiffs incurred pursuing the claim for breach of fiduciary duty against him.

This decision next turns to the plaintiffs' claim that Harron breached the Confidentiality Provision in the Operating Agreements by sharing confidential information that belonged to the Companies. Because that claim also belongs to the Companies, they are the natural plaintiffs and are the recipients of the remedy.

34

The Companies proved this claim. As a remedy, they are entitled to a permanent injunction requiring Harron to return all confidential information belonging to the Companies.

In their next claim, the plaintiffs asserted that by breaching the Confidentiality Provision, Harron caused the amounts he borrowed from the Trusts under a note to become immediately due and payable. The Trusts are the proper plaintiffs for this claim. The final judgment will require Harron to pay the Trusts the amount due in full satisfaction of the note.

The plaintiffs next sought to prove that plaintiff MSI Manager LLC ("International Manager"), the managing member of Metro International, has the right to exercise an option to acquire Harron's interests in Metro International. That claim logically belongs to International Manager, which is the appropriate plaintiff.

The plaintiffs proved this claim. The record establishes that International Manager did not exercise the right to acquire Harron's interests because the plaintiffs did not know about Harron's misconduct and saw no reason to eliminate his interest in an entity that they believed was valueless. International Manager will have thirty days from the entry of a final judgment in this action to exercise the option in accordance with its terms.

The plaintiffs also sought to prove that plaintiff LATAM Manager LLC ("LATAM Manager"), Metro LATAM's managing member, validly exercised an option to acquire Harron's interests in Metro LATAM. Because of this litigation, the transaction did not close. That claim logically belongs to Metro LATAM's managing member, which is the appropriate plaintiff.

35

The record shows that Harron did not dispute the valuation that LATAM Manager placed on his units in Metro LATAM. The final order will direct the parties to complete the transaction at the price identified in this decision.

Finally, the plaintiffs assert a claim under the Stored Communications Act. The Companies are the proper plaintiffs for this claim. The plaintiffs proved that Harron breached the Stored Communications Act, entitling the Companies to statutory damages in the amount of $1,000, plus an award of attorneys' fees and costs for the amounts incurred litigating the claim under the Stored Communications Act.

## A.      Breach Of Fiduciary Duty

The plaintiffs proved at trial that Harron breached the fiduciary duties that he owed in his capacity as President of the Companies.[4] The plaintiffs failed to prove that they were entitled to the full extent of the remedy that they sought.

---

[4] As this framing suggests, the parties lumped the Companies together for purposes of the claim. In practice, the claim for breach of fiduciary duty predominantly concerns Metro International. That was the entity that the Nagel brothers and Harron formed in 2012, and that was the entity where Harron was expected to have a hands-on role helping to create a new self-storage business from scratch in Brazil. Metro LATAM only entered the scene in March 2017, seventeen months before Harron resigned from his positions. Metro LATAM involved a minority investment in an existing business, and Harron had a more passive role than with Metro International. To the extent Harron's activities breached his fiduciary duties, his breaches primarily affected Metro International.

### 1.  The Elements Of A Claim For Breach Of Fiduciary Duty

A claim for breach of fiduciary duty is an equitable tort.[5] The claim has only two formal elements: (i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) a breach of that duty.[6]

The first element of the equitable tort requires that the plaintiff prove by a preponderance of the evidence that the defendant was a fiduciary for the plaintiff. The plaintiff also must establish the nature of the fiduciary duties that the defendant owed. These aspects closely resemble the showings that a plaintiff must make when pursuing a traditional common law tort, where the plaintiff must demonstrate that the defendant owed the plaintiff a duty and establish the nature of the duty owed. *See Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *23 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE).

---

[5] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see also* Restatement (Second) Torts § 874 cmt. b (Am. L. Inst. 1979), Westlaw (database updated Oct. 2021) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct . . . ."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[6] *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *accord ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)).

The second element of the equitable tort, however, differs considerably from its common law counterpart. When evaluating a traditional common law tort, the court analyzes the question of breach using the standard of conduct that the defendant was expected to follow.[7] For the equitable tort, the court evaluates the question of breach through the lens of one of several possible standards of review.[8] Entity law generally uses three standards of review: a default standard of review that is highly deferential and known as the business judgment rule; an intermediate standard of review known as enhanced scrutiny; and an onerous standard of review known as the entire fairness test. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457–59 (Del. Ch. 2011). "In each manifestation, the standard of review is more forgiving of [defendant fiduciaries] and more onerous for [the] plaintiffs than the standard of conduct."[9] To determine whether the

---

[7] *See generally* Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 461–67 (1993).

[8] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35–36 (Del. Ch. 2013); *see also* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002) [hereinafter *Realigning the Standard*]; William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001) [hereinafter *Function Over Form*].

[9] *Chen*, 87 A.3d at 666; *see also id.* at 667 ("The numerous policy justifications for this divergence largely parallel the well-understood rationales for the business judgment rule."). For cogent explanations, see *Function over Form*, *supra*, at 1296, and *Realigning the Standard*, *supra*, at 451–57. *Accord* Eisenberg, *supra*, at 461–67; E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1421–28 (2005); Julian Velasco, *The Role of Aspiration in Corporate Fiduciary*

fiduciary breached its duties, the court evaluates the fiduciary's conduct using the applicable standard of review. If the fiduciary's conduct fails to pass muster under the applicable standard of review, then a breach of duty exists. If the fiduciary's conduct passes muster under the applicable standard of review, then no breach of duty exists.[10]

In responding to the plaintiffs' claims, Harron never sought to defend his conduct by proving that he satisfied a particular standard of review. The plaintiffs addressed the element of duty and breach, framed in terms of the standard of conduct. Harron made arguments in response, but did not seek to prove that his conduct was entirely fair to the Companies. This decision evaluates the plaintiffs' claims using the framework that the parties used.

---

*Duties*, 54 Wm. & Mary L. Rev. 519, 553–58 (2012). Opinions articulating the policy rationales for applying standards of review that are more lenient than the underlying standards of conduct include *Brehm v. Eisner*, 746 A.2d 244, 255–56 (Del. 2000) and *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (Allen, C.).

[10] *See Trados II* , 73 A.3d at 35–36 ("The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct."). Under this framework, after the plaintiff establishes a prima facie case of breach, the defendant fiduciaries have the opportunity to prove that their actions satisfied the entire fairness test, giving them a further chance to avoid a finding of breach. If the defendant fiduciaries prove that their conduct was entirely fair, then they did not breach their duties, even if the conduct might otherwise have been self-interested or grossly negligent. *See, e.g.*, *id.* at 78 (finding transaction was entirely fair despite defendants' failure to follow a fair process); *see also In re Dole Food Co., Inc. S'holders Litig.*, 2015 WL 5052214, at *34 n.26 (Del. Ch. Aug. 27, 2015) (discussing possibility of altruistic controller who effectuates a transaction using an unfair process for purpose of conferring a more-than-fair result). Through this mechanism, fiduciary defendants have an additional defensive opportunity that the typical tort defendant lacks.

## 2. The First Element: Harron's Status As A Fiduciary And The Scope Of His Duties

Harron served as President of the Companies. In that capacity, he was an officer of each entity. Harron agrees that in his capacity as an officer, he was a fiduciary, but he disputes the scope of his duties.

### a. Officer Duties Under The Common Law

The Delaware Supreme Court has held that a corporate officer owes the same fiduciary duties as a corporate director. *See Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009). Directors of a Delaware corporation owe two fiduciary duties—loyalty and care.[11] At a minimum, officers owe those same duties. *Gantler*, 965 A.2d at 708–09.

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Corporate fiduciaries—both officers and directors—"are not permitted to use their position of trust and confidence to further their private interests." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, i.e., a condition, of the fundamental duty of loyalty." *Stone*, 911 A.2d

---

[11] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("[D]irectors owe fiduciary duties of care and loyalty."); *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care. . . .").

at 370 (cleaned up). "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[12]

So far, each aspect of the director's duty of loyalty maps easily onto the officer role. Like directors, officers must "place the interests of the corporation and shareholders that they serve before their own." *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *25 (Del. Ch. Oct. 28, 2013). And like directors, officers have a duty to act "loyally by trying to do their job for proper corporate purposes in good faith," rather than disloyally by in bad faith putting other interests, such as the self-interest of a superior, ahead of the corporation's best interest. *Hampshire Gp.*, 2010 WL 2739995, at *12.

The officer's duty of loyalty, however, has additional dimensions, precisely because officers act as agents for the entity.[13] Agents are fiduciaries.[14] Under a particularly well-

---

[12] *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 67 (Del. 2006) (cleaned up); *accord Stone*, 911 A.2d at 369 (quoting *Disney II*, 906 A.2d at 67); *see Gagliardi*, 683 A.2d at 1051 n.2 (defining a "bad faith" transaction as one "that is authorized for some purpose *other than* a genuine attempt to advance corporate welfare or is *known to constitute* a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[13] *See Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *21 (Del. Ch. Jan. 13, 2020) ("Officers also are fiduciaries in their capacities as agents who report to the board of directors."), *aff'd*, 243 A.3d 417 (Del. 2020).

[14] Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006), Westlaw, (database updated Mar. 2022) [hereinafter Restatement of Agency] (defining agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person

(an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act"); *id.* § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship"); *see Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing."); Ramon Casadesus-Masanell & Daniel F. Spulber, *Trust and Incentives in Agency*, 15 S. Cal. Interdisc. L.J. 45, 68 (2005) ("While all agents are fiduciaries, not all fiduciaries are agents."); Thomas Earl Geu, *A Selective Overview of Agency, Good Faith and Delaware Entity Law*, 10 Del. L. Rev. 17, 20 (2008) (explaining that fiduciary status is "a result of agency" and collecting authorities establishing the point); Barak Orbach, *D&O Liability for Antitrust Violations*, 59 Santa Clara L. Rev. 527, 560 n.2 (2020) ("All agents are fiduciaries but not all fiduciaries are agents").

There are Delaware cases which assert errantly that an agency relationship, standing alone, does not give rise to fiduciary duties on the part of the agent. *See Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *20 (Del. Ch. Mar. 5, 2014) ("Under Delaware law, the relationship of agent to principal does not itself give rise to fiduciary duties." (citing *Prestancia Mgmt. Gp., Inc. v. Va. Heritage Found., II LLC*, 2005 WL 1364616, at *6 (Del. Ch. May 27, 2005)). That assertion can be traced to *Metro Ambulance, Inc. v. Eastern Medical Billing, Inc.*, where it originated. 1995 WL 409015, at *3 (Del. Ch. July 5, 1995) ("The existence of a principal/agent relationship does not, in and of itself, give rise to a fiduciary relationship."). As the sole support for that assertion, the *Metro Ambulance* decision cited *Maull v. Stokes*, 68 A.2d 200 (Del. Ch. 1949), but the *Maull* decision did not say that not all agents are fiduciaries. The case involved a contractor who was hired to build a house and a garage. The contractor performed additional work not covered by the contract, and when he was not paid, he filed a mechanic's lien. The homeowner sued in the Court of Chancery for an accounting, and the question was whether equitable jurisdiction existed. The court held that there is "an implied relation of principal and agent between the owner of property and a general contractor for the construction of a building thereon." *Id.* at 202. In the sentence that the *Metro Ambulance* court seems to have relied on, the *Maull* court stated that "[e]quity will not compel an agent to account to his principal merely because of the existence of that relation." *Id.* That sentence addresses the availability of an accounting. It does not suggest that some agents are not fiduciaries to their principals. To the contrary, the court exercised jurisdiction over the suit because (1) there was a fiduciary relationship and (2) the numerous details of the transaction meant that the matter could not be determined accurately or fairly by a jury in a court of law. *Id.* at 202–03. The assertion that some agents are not fiduciaries is not accurate and would cause Delaware law to conflict with settled doctrine.

developed body of fiduciary law, agents owe additional and more concrete duties to their principal.[15]

The officer's duty as agent also includes a duty of care, and the intersection of that duty with the directorial notion of care traditionally presented a range of questions under Delaware law. An agent has a duty to use reasonable care, competence, and diligence, and the applicable standard takes into account any special skills or knowledge possessed by the agent.[16] A director's duty of care is different. The Delaware Supreme Court has framed the obligation in terms of whether the directors have "inform[ed] themselves, prior to making a business decision, of all material information reasonably available to them."[17] And although that standard speaks of reasonableness, "under the business judgment rule director liability is predicated upon concepts of gross negligence." *Aronson*, 473 A.2d at 812. Moreover, for purposes of a care claim, directors also generally are not held to a higher

---

[15] *See generally* Restatement of Agency, *supra*, §§ 8.02–.12.

[16] *See id.* § 8.08 ("Subject to any agreement with the principal, an agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances. Special skills or knowledge possessed by an agent are circumstances to be taken into account in determining whether the agent acted with due care and diligence. If an agent claims to possess special skills or knowledge, the agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents with such skills or knowledge.").

[17] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *accord Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) (quoting *Aronson*); *id.* at 877 ("Here, the issue is whether the directors informed themselves as to all information that was reasonably available to them.").

standard based on their special knowledge or expertise.[18] Finally, in the corporate context, gross negligence has its own special meaning that is akin to recklessness.[19]

---

[18] *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 128 n.63 (Del. Ch. 2009) ("Directors with special expertise are not held to a higher standard of care in the oversight context simply because of their status as an expert."); *Canadian Com. Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *7 n.54 (Del. Ch. Feb. 22, 2006) ("[N]o Delaware case has held that directors with professional qualifications are held to a higher standard of care in the duty of oversight context"). One decision has considered a director's special expertise when evaluating whether the director acted in good faith. *In re Emerging Commc'ns Inc. S'holders Litig.*, 2004 WL 1305745, at *39–40 (Del. Ch. June 4, 2004) (imposing liability on director with expertise as investment advisor who therefore was in a "unique position to know that" the squeeze-out price was "unfair"). That decision provoked a strong response. *See, e.g.*, Gregory Perry, Note, *Emerging Communications and the Résumé Approach to Bad Faith Claims*, 1 N.Y.U. J.L. & Bus. 771, 796 (2005) (arguing against evaluating director conduct based on special skills or expertise).

[19] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." (cleaned up)); *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." (cleaned up)); *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (Allen, C.) (explaining that to be grossly negligent, a decision "has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion" (cleaned up)).

By contrast, in civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'" *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (quoting W. Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)). This test "is the functional equivalent" of the test for "[c]riminal negligence." *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987). By statute, Delaware law defines "criminal negligence" as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that

Because of the different standards that govern the duty of care, a debate has long existed over whether an officer's duty of care would resemble the agency regime or the director regime. If the former applied, then an officer could be liable for simple negligence, like agents generally, and the analysis would take into account the officer's special knowledge or expertise. If the latter applied, then a more deferential standard, such as gross negligence, would apply, and the analysis would not take into account the officer's special knowledge or expertise.[20]

---

failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

11 *Del. C.* § 231(a). The same statute provides that a person acts recklessly when "the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct." *Id.* § 231(e). As with criminal negligence, the risk "must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.*; *see id.* § 231(a). Under this framework, gross negligence "signifies more than ordinary inadvertence or inattention," but it is "nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm." *Jardel*, 523 A.2d at 530.

[20] For examples of the debate, see Paul Graf, *A Realistic Approach to Officer Liability*, 66 Bus. Law. 315 (2011); Lawrence A. Hamermesh & A. Gilchrist Sparks III, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Bus. Law. 865 (2005); Lyman P.Q. Johnson & David Millon, *Recalling Why Corporate Officers Are Fiduciaries*, 46 Wm. & Mary L. Rev. 1597 (2005); Lyman Johnson & Robert Ricca, *Reality Check on Officer Liability*, 67 Bus. Law. 75 (2011); A. Gilchrist Sparks, III & Lawrence A. Hamermesh, *Common Law Duties of Non-Director Corporate Officers*, 48 Bus. Law. 215 (1992). For other scholarly analyses addressing the officer's role as corporate agent, see Amitai Aviram, *Officers' Fiduciary Duties and the Nature of Corporate Organs*, 2013 U. Ill. L. Rev. 763; Donald C. Langevoort, *Agency Law Inside the Corporation: Problems of Candor and Knowledge*, 71 U. Cin. L. Rev. 1187 (2003); Megan W. Shaner, *Restoring the Balance of Power in Corporate Management: Enforcing*

A comparatively recent series of decisions have adopted the director model. In the first in the series, this court stated that "[u]nder Delaware law, the standard of care applicable to the fiduciary duty of care of a director or officer is gross negligence." *Buckley Fam. Tr. v. McCleary*, 2020 WL 1522549, at *10 (Del. Ch. Mar. 31, 2020). The decision relied on *Gantler* and did not discuss the agency dimensions of an officer's role or the debate over their implications. Subsequent Court of Chancery decisions have embraced gross negligence as the standard for evaluating an officer's breach of the duty of care.[21] A critical mass of decisions thus has tacitly resolved the debate in favor of using the director model for the officer's duty of care.

The foregoing legal principles establish the baseline for Harron's duties as an officer. He owed a duty of loyalty that encompassed both the parameters of the duty owed

---

*an Officer's Duty of Obedience*, 66 Bus. Law. 27 (2010); Megan W. Shaner, *The (Un)Enforcement of Corporate Officers' Duties*, 48 U.C. Davis L. Rev. 271 (2014).

[21] *See Harcum v. Lovoi*, 2022 WL 29695, at *27 (Del. Ch. Jan. 3, 2022) ("As discussed above, the Complaint does not state a claim that the Proxy contained material omissions or inaccurate disclosures. Even if any of the alleged omissions or inaccurate disclosures were material, I am not persuaded that they were the product of gross negligence on the part of [individual defendants] in their capacities as officers of the Company."); *Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *1 (Del. Ch. Aug. 16, 2021) ("Even if *Revlon* did apply, the Complaint fails to well plead non-exculpated claims against each director. As to the claims against [a defendant] in her capacity as an officer, the Complaint fails to well plead either that she was conflicted, implicating her duty of loyalty, or that she acted with gross negligence at any time during the negotiation process, implicating her duty of care."); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *66 (Del. Ch. May 6, 2021) ("An officer's compliance with the duty of care is evaluated for gross negligence."); *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *15 (Del. Ch. Oct. 27, 2020) ("Under Delaware law, the standard of care applicable to the fiduciary duty of care of an officer is gross negligence.").

by directors and the additional dimensions of the duty that apply to agents. He also owed a duty of care, albeit a duty framed by the gross negligence standard and attendant corporate law concepts, rather than the simple negligence standard and attendant agency concepts.

### b. Whether The Operating Agreements Modified Harron's Duties

Harron accepts that he was an officer of the Companies and that he owed fiduciary duties, but he argues that the Operating Agreements modified the scope of his duties. In making this argument, Harron misconstrues a provision addressing exculpation.

The Delaware Limited Liability Company Act (the "LLC Act") authorizes a limited liability company agreement to modify the duties (including fiduciary duties) that a member, manager, or other person otherwise would owe under common law. The operative language states:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

6 *Del. C.* § 18-1101(c).

The LLC Act also permits a limited liability company to limit or eliminate the liability that a fiduciary will face in the event of breach.

> A limited liability company agreement may *provide for the limitation or elimination of any and all liabilities* for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not

47

> limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

*Id.* § 18-1101(e) (emphasis added). Limiting or eliminating liability is different than limiting or eliminating the underlying duty. A provision that limits or eliminates liability only addresses one of the available remedies for breach of duty, i.e., liability for money damages. It does not limit or eliminate the duty itself. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012).

Harron argues that the Operating Agreements limited the fiduciary duties he owed to the Companies. Dkt. 130 ("DOB") at 20. He relies on a provision that appears in both Operating Agreements:

> Each Member, Manager and Officer . . . shall not be liable to the Company for any loss, liability or damage suffered or incurred by the Company, directly or indirectly, in connection with its activities, unless such loss liability or damage was caused by such Member's, Manager's or Officer's fraud, gross negligence or willful misconduct.

IOA § 10.8(b); LOA § 10.8(b) (the "Exculpatory Provision").

The Exculpatory Provision does not eliminate or modify any fiduciary duties. The Exculpatory Provision is just that—an exculpatory provision that generally eliminates the availability of money damages as a remedy for breaches of duty, subject to enumerated exceptions. The fiduciary obligations remain, as does the availability of remedies other than money damages. *See Feeley*, 62 A.3d at 663–65.

When an entity has an exculpatory provision in its governing document, then the court first must determine whether the fiduciary committed a breach of duty. If so, then the court must determine the nature of the breach. Under the Exculpatory Provision, Harron

48

cannot be held liable unless the liability or damage "was caused by . . . fraud, gross negligence, or willful misconduct." *See* IOA § 10.8(b); LOA § 10.8(b). After addressing the claims for breach of fiduciary duty, this decision returns to that issue.

### 3. The Second Element: Harron's Breach Of His Duties

The plaintiffs sought to prove the following four breaches of fiduciary duty:

- Harron breached his duty of loyalty by consulting for Gouveia and his affiliates.

- Harron breached his duty of loyalty by failing to disclose his consulting.

- Harron breached his duty of loyalty by obtaining the $10 million in equity financing from New Sparta for Gouveia's cold-storage business and by failing to present the financing opportunity to Metro International or Metro LATAM.

- Harron breached his duty of loyalty by sharing confidential information belonging to the Companies with Gouveia and others.

The plaintiffs succeeded in proving each breach of duty.

#### a. Harron's Consulting For Gouveia And His Companies

In their broadest claim, the plaintiffs assert that Harron breached his fiduciary duties by consulting for Gouveia. Harron argues that this claim fails because he was not prohibited from pursuing outside employment. DOB at 32. He also relies on the following statement from *Guth v. Loft*: "As a general proposition it may be said that a corporate officer or director is entirely free to engage in an independent, competitive business, so long as he violates no legal or moral duty with respect to the fiduciary relation that exists between the corporation and himself." 5 A.2d at 514.[22]

_____

[22] The modern agency rule is different:

49

The plaintiffs proved that Harron violated his fiduciary duty of loyalty by placing his own interests and the interests of his other clients ahead of the Companies' interest. While Harron might have been free in the abstract "to engage in an independent, competitive business," in this case he violated a legal and a moral duty to the Companies by devoting his time and resources to other clients.

"Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision." *U.S. West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996) (Allen, C.). An agent has a duty "not to use property of the principal for the agent's own purposes or those of a third party." Restatement of Agency, *supra*, § 8.05(1).

> This rule is a specific application of an agent's basic fiduciary duty . . . . The rule is also a corollary of a principal's right, as an owner of property, to exclude usage by others. An agent is subject to this duty whether or not the agent uses property of the principal to compete with the principal or causes harm to the principal through the use. An agent may breach this duty even when the agent's use is beneficial in some sense to the property or to the principal. An agent is subject to liability to the principal for any profit made by the agent while using the principal's property when the use facilitates making the profit, or otherwise for the value of the use.

*Id.* cmt. b.

---

> Throughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors. During that time, an agent may take action, not otherwise wrongful, to prepare for competition following termination of the agency relationship.

Restatement of Agency, *supra*, § 8.04.

50

Harron's duty of loyalty as an agent included a duty to use the Companies' resources for their benefit. Harron's duty of loyalty as an agent included a duty to not use the Companies' resources for his own benefit and for the benefit of his other clients. The time that the Companies paid Harron to devote to their business was a resource that Harron was obligated to use for the Companies' benefit.

In this case, the parties reached an understanding consistent with the baseline rule. The Nagel brothers and Harron agreed that Harron would devote his full time to the international operation. In furtherance of that agreement, Harron committed not to take on any new consulting engagements after May 24, 2012, and to wrap up all of his outside consulting engagements by November 24, 2012. Harron Tr. 12–13; Matthew Tr. 190–92.

The plaintiffs proved that Harron breached his duty of loyalty by devoting substantial time and energy to outside consulting projects when he was supposed to be devoting his time and energy to building the international business. Harron admits that he "spent time during [his] workday and took the time to draft and send extensive emails" relating to his outside consulting ventures. Harron Tr at 45. Harron made phone calls and took meetings.[23] He admitted to taking calls for his outside consulting at "any point during the day." Harron Tr. 51. He admitted to spending time on email during the day. *Id.* at 45.

---

[23] *See* JX 50 (schedule of Harron's participation in a three-day meeting with Spire); *see also* JX 36 (noting Harron's participation in what was billed as an "in-depth rewarding telephone conference").

51

The record demonstrates that the scope of the work that Harron undertook was significant. The letters governing the Tremont Engagement and the Cold-Storage Engagement show Harron taking on a broad scope of responsibility. *See* JX 1; JX 9. As Harron admitted at trial, the work was comparable to what he was supposed to be doing as President of Metro International. Harron Tr. 42. Under the Cold-Storage Engagement, Harron's charge was to take Spire's existing cold-storage business model and help Spire expand internationally, initially through a start-up operation in India or Bangladesh. In return, Harron received base compensation plus a future equity stake. JX 1 at 5. At Metro International, Harron's charge was to take Metro US's existing self-storage business model and help the Nagel brothers expand internationally, initially through a start-up operation in Brazil. In exchange, he received base compensation plus an equity stake.

As noted, after accepting the job with Metro US, Harron emailed Gouveia to discuss "the status of [his] Brazilian self storage business and how [he saw] that venture playing out." JX 7 at 1. He specifically wanted to discuss "how it might impact the time [he] c[ould] dedicate to [Gouveia] and the cold storage business going forward." *Id.* By broaching this issue, Harron demonstrated his awareness that he could not devote his full time to both projects.

To defend his conduct, Harron denigrated the plaintiffs' assertions about his consulting as "speculative at best and entirely unsupported." DOB at 34. It is true that no one can tell precisely how much time Harron spent on his outside activities, but that is because Harron kept his consulting secret. He did not keep time records, and he did not document what he was doing.

52

Nevertheless, there is substantial evidence to support a finding that Harron devoted significant time to consulting for Gouveia and his affiliates. That evidence includes the engagement letters that described the services that Harron agreed to provide to Gouveia and his affiliates, which Harron admitted was "precisely the type of work that [he was] doing as the president of" Metro International. *Id.* at 43. His work for Metro International was supposed to be a full-time job, and Harron claimed to work at least forty hours, and sometimes eighty hours, per week on his job for Metro International. *Id.* at 104. As noted previously, one of the projects that Harron worked on was the Cold-Storage Engagement, which essentially was building a cold-storage facility from the ground up for Spire in India, just as Harron had committed to build a self-storage business from the ground up for Metro International in Brazil.

The evidence also includes the 15,000 emails that Spire produced relating to Harron's consulting. Moreover, Harron's emails reflect extensive, time-consuming work. Matthew Tr. 227–28. For example, one of the emails includes Harron's comments on a complex memorandum setting the terms and conditions of a financing deal with Spire. JX 59. In addition to the emails, Harron regularly participated in teleconferences and in-person meetings, with calls often happening during normal working hours when he was obligated to devote himself to Metro US's and the Companies' business. *See, e.g.*, *id.*; *see also* Harron Tr. 50–51. One of his extracurricular commitments took him to a three-day meeting at Spire's offices. JX 50 at 2; Harron Tr. 54. Matthew personally reviewed many of Harron's emails and the attached documents; he testified credibly that many were highly detailed and would have taken significant time to prepare. Matthew Tr. 227–28.

53

In response, Harron offered self-serving testimony that he did not spend substantial time on his consulting work. He claimed that "on average over the course of a week," he might have spent "an hour or two" on consulting. Harron Tr. 143. Harron admitted that it was only a "guess," and that the work "would go in waves." *Id.* Harron's testimony on this subject was not credible.

Harron also attempted to defend his conduct by asserting that his performance reviews suggest he was a good employee. *See, e.g.*, JX 120 at 2. The reviews were mixed. When the Nagel brothers praised Harron, it was usually for making efforts to secure financing and engaging in other investment-oriented tasks. By contrast, the Nagel brothers consistently criticized Harron for his failure to devote attention to the operational side of the business. Many of these comments indicate that Harron was not devoting sufficient time to his job:

- In Harron's review at the end of 2013, the Nagels wanted Harron to focus more on MetroFit and to "[p]rioritize MetroFit['s] operational initiatives." JX 121 at 2. Matthew noted that Harron "landed far short" in his efforts to establish reporting systems for MetroFit and that as a result, Metro did "not have the firm view on the business that we should." *Id.* at 1. Matthew gave Harron a list of specific operational tasks to complete. *Id.* at 3. He wanted Harron to visit Brazil at least four times and to close on an additional four to ten site locations in 2014. *Id.* at 4.

- At the end of 2014, the Nagel brothers made clear that Harron still was not visiting Brazil enough. JX 120 at 1. The review also makes clear that Harron had not addressed the issues from 2013, such as financial reporting. *Id.* The Nagel brothers gave him specific goals for the first quarter of 2015 that included for each month, "meet[ing] the deadline . . . for accurate and understandable financial reports issuance for [Metro International] and MetroFit." *Id.*

- At the end of 2015, the Nagel brothers identified basic tasks that Harron was not completing, such as "[p]roper papering of all resolutions and legal and accounting management." JX 119 at 1.

54

Harron could have accomplished these tasks if he had devoted all of his time to Metro International. As Gallagher explained, "[i]n hindsight, knowing what generally has come out since his departure, I think there would be a significant amount of time he should have been investing . . . in our venture with [Metro International] that he was not investing at the time." Gallagher Tr. 303.

Harron breached his fiduciary duties by engaging in consulting for Gouveia and his affiliates. By pursuing that work, Harron acted contrary to the best interests of the Companies.

### b. Harron's Failure To Disclose His Consulting

As a second breach of duty, the plaintiffs asserted that Harron failed to disclose his outside consulting. As noted in the preceding section, Harron breached his fiduciary duties by engaging in outside consulting. Under this claim, the issue is whether Harron committed an additional breach of fiduciary duty by failing to disclose his activities.

"An agent owes the principal a duty to provide information to the principal that the agent knows or has reason to know the principal would wish to have."[24] That duty exists

---

[24] Restatement of Agency, *supra*, § 8.11 cmt. b; *see Estate of Eller v. Bartron*, 31 A.3d 895, 898 (Del. 2011) ("Agents owe their principals a duty to disclose certain information, and a duty to avoid gaining an interest adverse to their principal."); *Mills Acq.*, 559 A.2d at 1283 ("As the duty of candor is one of the elementary principles of fair dealing, Delaware law imposes this unremitting obligation not only on officers and directors, but also upon those who are privy to material information obtained in the course of representing corporate interests."); *Sci. Accessories*, 425 A.2d at 962 ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing. Encompassed within such general duties of an agent is a duty to disclose information that is relevant to the affairs of the agency entrusted to him." (citation omitted)); *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115,

because "[a] principal's decisions may also be affected by information about an agent and the agent's conduct once the agent has been retained by the principal." Restatement of Agency, *supra*, § 8.11 cmt. b. "An agent's duty to provide information extends to information about the agent when it is material to decisions the principal may wish to make." *Id.* With the benefit of that information, the principal can "take action to protect the principal's interests." *Id.* "For example, if an agent provides the principal with notice that the agent will be unable to perform as previously directed, the principal may choose another agent . . . ." *Id.*

As noted, the Nagel brothers and Harron reached an understanding that Harron would not take on any new consulting engagements after May 24, 2012, that he would wrap up all of his outside consulting engagements by November 24, 2012, and that he would not engage in any outside consulting work without permission from the Nagel brothers. Implicit in that understanding was an expectation that Harron would make full disclosure regarding any outside consulting work. *See Hollinger Int'l, Inc. v. Black*, 844

_____

at *14 (Del. Ch. May 18, 2009) ("Agents owe a duty to disclose relevant information if they have notice of facts which they should know may affect the decisions of their principals as to their conduct."), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE); Restatement (Second) of Agency § 381 cmt. d (Am. L. Inst. 1958), Westlaw (database updated Mar. 2022) ("If the agent . . . is competing with the principal and using information acquired during his agency, he is under a duty to the principal to reveal such facts . . . ."); *see also* 3 Am. Jur. 2d Agency § 222, Westlaw (database updated Feb. 2022) ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when . . .[s]ubject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal.").

A.2d 1022, 1061–62 (Del. Ch. 2004), *aff'd*, 872 A.2d 599 (Del. 2005). Yet Harron did not disclose that he started the Tremont Engagement in August 2012. He also did not disclose that he continued working on numerous engagements after November 24, 2012. Harron kept his consulting secret precisely because he knew that he was not supposed to be doing it and that the Nagels would not authorize it. Harron Tr. 172–73.

Information about Harron's consulting was information that the Nagel brothers and the Companies "would wish to have." *See* Restatement of Agency, *supra*, § 8.11 cmt. b. Harron breached his duty of loyalty by engaging in consulting without disclosing it. *See Triton Const.*, 2009 WL 1387115, at *12, *14.

### c.    The Usurpation Of A Financing Opportunity

In their third theory of breach, the plaintiffs sought to prove that Harron breached his duty of loyalty by securing equity financing for Spire's cold-storage business from New Sparta while failing to present the opportunity to the Companies.[25] The plaintiffs proved

---

[25] POB at 24–25. Harron claims that the plaintiffs are estopped from making this argument because they "plead no facts in their Complaint to put Harron on notice of a claim for usurpation of corporate opportunities in this action." DOB at 24. In support of this argument, Harron cites *ThoughtWorks, Inc. v. SV Investment Partners, LLC*, 902 A.2d 745 (Del. Ch. 2006). That case refused to address one of the plaintiff's claims because it "was not asserted in [the] complaint or in any submissions prior to trial, but rather was made for the first time in its post-trial brief." *Id.* at 754. The plaintiffs put Harron on notice of the claim in both the pretrial order and their pretrial brief. *See* PTO ¶ 77(d) ("Whether Defendant violated his fiduciary duties to [Metro International] and Metro LATAM by developing outside business ventures and providing unauthorized consulting services to third parties, which included presenting opportunities to those third parties that should have been presented to [Metro International] and Metro LATAM"); Dkt. 113 at 30–34 (stating in plaintiffs' pretrial brief that "Harron usurped corporate business opportunities for his

that Harron breached his duty of loyalty by failing to present this opportunity to the Companies.

The plaintiffs' claim regarding the New Sparta opportunity falls under what historically has been called the corporate opportunity doctrine, characterized here as the business opportunity doctrine. That doctrine is "one species of the broad fiduciary duties assumed by a corporate director or officer." *Broz*, 673 A.2d at 154. As framed by the Delaware Supreme Court,

> [a] corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimical to his duties to the corporation.

*Broz*, 673 A.2d at 154–55. "No one factor is dispositive and all factors must be taken into account insofar as they are applicable." *Id.* at 155. Rulings on business opportunity issues are therefore fact-intensive, and "[h]ard and fast rules are not easily crafted." *Id.* The bottom line is "whether or not the [fiduciary] has appropriated something for himself that, in all fairness, should belong to his [company]." *Equity Corp. v. Milton*, 221 A.2d 494, 497 (Del. 1966).

The opportunity consisted of a $10 million investment that Harron secured for a Spire affiliate. Harron did not connect the investor with the Companies. By securing the

---

own benefit," and citing *Broz v. Cellular Information Systems, Inc.*, 673 A.2d 148 (Del. 1996)).

investment for Spire, Harron received a commission of $131,250. JX 61 at 3. If he had secured the investment for the Companies, Harron would not have received any incremental compensation, because fundraising was already a "big part of [his] job." *See* Harron Tr. 130–31.

As traditionally framed, the *Broz* factors address a business opportunity that a company might pursue. The same concepts are nevertheless pertinent to an opportunity to obtain financing, and with modest changes, the *Broz* factors translate easily.

The first *Broz* factor asks whether the entity was "financially able to exploit the opportunity." *See Broz*, 673 A.2d at 155. For purposes of an investment, the question is whether the entity needed the investment and could have put it to productive use. Metro International needed capital and could have put an equity investment of $10 million to productive use. Gallagher testified credibly that "there was an ongoing attempt to find new capital." Gallagher Tr. 312–13. Gallagher and Matthew explained that additional capital would have been particularly helpful after 2016, when Goldman developed "cold feet" about being MetroFit's sole source of growth capital. Matthew Tr. 215; *see* Gallagher Tr. 301–02. Harron tried to suggest that the Companies' financial needs arose *after* he secured the investment for Gouveia, but that is not true; Harron worked on the investment in 2017, during the same period that he was engaged in an "ongoing attempt to find new capital" for MetroFit. *See* Gallagher Tr. 312. It is less clear that Metro LATAM needed equity capital or would have had a use for it.

The second *Broz* factor asks whether the opportunity is in the entity's line of business. *Pers. Touch Hldg. Corp. v. Glaubach*, 2019 WL 937180, at *14 (Del. Ch. Feb.

25, 2019). For purposes of an investment, the focus of this factor should be on whether the form of investment was suitable for the entity and *vice versa*. An opportunity to raise high-yield debt from a group of hedge funds would not be suitable to a company that had no pressing need for capital and which relied exclusively on equity financing for large capital projects and a revolving line of credit for short-term needs. By the same token, an early-stage venture in Brazilian real estate would not be a suitable investment for a fund that specialized in later stage investments in domestic technology companies.

For purposes of this case, no one argues about the type of the investment. Harron asserts that New Sparta would not have considered the Companies because they were in the self-storage business, not the cold-storage business. Harron was not a credible witness, and to the extent that he claimed to have discussed this issue with New Sparta, there is no contemporaneous evidence to corroborate his assertion. Instead, there is evidence to suggest that Harron did *not* explore having New Sparta invest in the Companies. Harron admitted at trial that he never "sought to access [the investor's] capital for purposes of any of the work that [he] was doing for [Metro International]." Harron Tr. 47–48. At most, Harron alluded to possible conversations involving general discussions about "potentially doing something together, the broader [Metro International] and [the investor's] capital provider." *Id.* at 48; *see also id.* at 159 (Q: "Did you ever discuss with [the investor] the opportunity to invest in self-storage with Metro?" A: "Conceptually, around different markets that might work, that he might be able to use it and leverage his contacts. But nothing ever really materialized from that."). Harron did not pursue anything concrete, and he did not "introduce anyone at Metro to [the investor] in that regard." *Id.* at 48.

60

The factual record does not support Harron's claim that New Sparta would not have considered an investment in the Companies. The record shows that self-storage and cold-storage investments are sufficiently similar that an investor in one could readily consider an investment in the other. Harron admitted at trial that New Sparta was not a targeted investor narrowly focused on the cold-storage business. Kirby represented a "high-net-worth . . . family office" that "would make investments in different asset classes." *Id.* at 158–59. The investor "[c]ertainly could have" made investments in both cold-storage and self-storage businesses. *Id.* at 159; *see* Blair Dep. 59–61.

The third *Broz* factor asks whether the entity has an interest or expectancy in the opportunity, with the answer typically turning on whether the individual who identified the opportunity did so in an official capacity. Harron contended that the New Sparta investment came to him in his personal capacity and therefore the Companies did not have any interest in it.

Under Delaware law, Harron had the burden of proof on that issue. *See In re eBay, Inc. S'holders Litig.*, 2004 WL 253521, at *4 (Del. Ch. Jan. 23, 2004). He failed to carry his burden. Harron offered nothing but his own testimony to support his account, and he did not suggest a credible way of distinguishing opportunities that came to him personally from opportunities that came to him in connection with his work for the Companies. The record shows that Harron did not segregate his work into different areas. Harron viewed everything he did as one big networking effort to create deals. The record is clear that Harron's responsibilities for the Companies included finding "other sources of capital and foreign investment." Harron Tr. 169; *see also* Matthew Tr. 203 ("[Harron is] in charge of

61

fundraising. [Harron is] in charge of getting capital, finding new markets, business partners, all that kind of stuff.").

The last *Broz* factor asks whether "by taking the opportunity for his own," the fiduciary was "placed in a position inimical to his duties to the corporation." *Broz*, 673 A.2d at 155. For a traditional business opportunity, this factor typically looks to whether the fiduciary will be competing in some way with the entity he serves or depriving it of an advantage. For a financing opportunity, those same considerations apply. By not presenting the New Sparta opportunity to the Companies, Harron deprived them of any chance to obtain it. Harron also benefited himself, because he received a six-figure commission from the Spire affiliate when he would not have received any incremental compensation from the Companies. *See In re Riverstone Nat'l Inc. S'holder Litig.*, 2016 WL 4045411, at *13 (Del. Ch. July 28, 2016).

All of the *Broz* factors support a finding that Harron deprived the Companies of an opportunity by failing to inform them about the prospect of obtaining capital from New Sparta. The plaintiffs proved that Harron breached his duty of loyalty by not presenting the New Sparta opportunity to the Companies.

### d. Misuse Of Confidential Information

Finally, the plaintiffs sought to prove that Harron breached his duty of loyalty by disclosing the Companies' confidential information to third parties and by using USB drives to take confidential information that belonged to the Companies. Harron did not contest the underlying acts, but he maintains that he could not have breached his duty of loyalty because he did not intend to harm the Companies. He also argued that the

Companies cannot assert a claim for breach of fiduciary duty based on misuse of confidential information because the Operating Agreements contain the Confidentiality Provision, making a claim for breach of fiduciary duty duplicative of a contract claim.

Under settled principles of agency law, "[a]n agent has a duty . . . not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party." Restatement of Agency, *supra*, § 8.05. This duty is a "specific application" of the agent's basic fiduciary duty of loyalty. *Id.* cmt. b. As discussed below, Harron breached this duty.

Whether the agent breaches the duty does not turn on "whether or not the agent uses property of the principal to compete with the principal or causes harm to the principal through the use." *Id.* The fiduciary obligation prevents the agent from using the property or information except for the benefit of the principal. *See J. Leo Johnson, Inc. v. Carmer*, 156 A.2d 499, 503 (Del. 1959) (explaining that "the duty of a trustee or agent to the other parties to the agreement would be equally as great as would be in the case of a joint adventure. . . . [and would] preclude one of them from dealing with property relating to the enterprise, either for himself or another, in the absence of full disclosure to his associates").

The Companies proved that Harron breached his duty of loyalty by sharing the Companies' confidential information for his own purposes, then taking the Companies' confidential information for his own purposes. In both cases, Harron acted intentionally.

### i. The Shared Information

The plaintiffs proved that Harron breached his duty of loyalty by sharing confidential information that belonged to Metro International, MetroFit, and Metro

63

LATAM. During his work on the Cold-Storage Engagement, Harron shared confidential information with Gouveia and his associates. *See* Harron Tr. 61–70. He shared three emails that related to the transaction with Goldman that Harron negotiated for Metro International and MetroFit (the "Goldman Transaction"):

- An overview of the respective ownership interests after the Goldman Transaction. JX 43.

- A description of the negative control rights that Goldman had received in the Goldman Transaction. JX 47.

- The economic terms of the Goldman Transaction, including a diagram of the structure. JX 48.

He also shared a description of Metro International's and Metro LATAM's targeted returns for investments in the United States, Central America, and Brazil. JX 31 (the "Targeted Returns Email"). It is impossible to know what information Harron shared orally in addition to these four emails (collectively, the "Shared Information"). In light of the work that Harron did for Gouveia and his associates, it seems likely that the Shared Information is indicative rather than exclusive.

Harron concedes that the Shared Information was confidential or, at the very least, "certainly sensitive." *See* Harron Tr. 61–70. The evidence demonstrates that Harron disclosed the Shared Information to Gouveia and his associates as part of the Cold-Storage Engagement. He provided the information to advance his personal interests as a consultant to Gouveia.

In his posttrial brief, Harron tried to claim that he was playing the long game and disclosed the Shared Information "as a way to build his relationship with Gouveia with the

64

hope that it would benefit [Metro International] or [Metro] LATAM in the future." DOB at 22. That is a fantastical recharacterization of his testimony. As support, Harron cited the following exchange during trial:

[Plaintiffs' Counsel]: And I think it's clear, but this information is not being sent for the benefit of MetroFit or Metro International in any way, is it?

[Harron]: I – I'd answer it this way: I'd say no, technically, but part of my rationale, I think, for being hired was working with my contacts. So the hope was that, albeit confidential information notwithstanding, at some point, this could help us benefit, our way. But you're exactly right, the components of this particular deal and the economics were not benefitting us in any way.

Harron Tr. 63–64. That testimony does not credibly support Harron's claim that he disclosed the Shared Information with the long-term goal of benefiting the Companies. That testimony instead shows Harron's gift for coming up with after-the-fact rationalizations for his misconduct. In this instance, his theory was that disclosing the Shared Information might, in a universe of infinite possibility, someday inure to the benefit of the Companies or their affiliates.

Harron's actions and his testimony on other issues suggested an ethical compass in need of calibration. For example, one of the documents he downloaded to a USB drive was titled "CONFIDENTIAL PRIVATE OFFERING MEMORANDUM." JX 6; *see* Harron Dep. 266–70. When asked whether he understood that the document was confidential, Harron at first said, "No." Harron Dep. 269. In the next breath, he changed his answer: "Was I aware that it was confidential? Yes. . . . I agree with you it's confidential, sensitive information. I acknowledge that." *Id.* at 269–70. At trial, when asked why he downloaded the confidential information, Harron testified: "You know, I thought . . . I was entitled to

65

do that, obviously, confidentiality issues notwithstanding. That is the reason I took it." Harron Tr. 90.

Harron willfully disclosed the Shared Information to benefit himself and Gouveia. He knew the information was confidential, and he shared it anyway because he was working as a consultant for Gouveia. By doing so, Harron breached his duty of loyalty.

### ii. The Downloaded Documents

The plaintiffs separately proved that Harron knowingly downloaded confidential information onto three USB drives, both during and after his employment (collectively, the "Downloaded Documents"). The plaintiffs proved that Harron took the Downloaded Documents for his own purposes.

Harron produced two of the USB drives. The record establishes that the Downloaded Documents on those drives contained the Companies' confidential information. Examples of the Downloaded Documents include:

- A letter of intent Harron received in connection with the Mr. Bodeguitas venture that listed, among other things, anticipated terms of the Shareholders Agreement, the valuation of Mr. Bodeguitas' and Metro International's ownership stake, the planned investment structure, and preferred governance practices. JX 35.

- An "Investment Summary" depicting the ownership structure of Metro LATAM, as well as detailing the ownership structure of Mr. Bodeguitas, including the names of the "collection of influential Central American businessmen who are involved in leading businesses in many of the markets in which Mr. B[odeguitas] operates," and the percentage of equity each owned. JX 41 at 2. It also lists the markets in which Mr. Bodeguitas operates, as well as specific details on Mr. Bodeguitas' financial performance. *Id.*

- Additional documents relating to Mr. Bodeguitas' legal structure and finances. JX 45 (legal structure); JX 65 (financial figures).

Harron never produced the third USB drive, claiming he could not find it. It is therefore impossible to know what it contained. The plaintiffs previously filed a motion seeking an adverse inference that the third USB drive "would contain forensic evidence" similar to that found on the first two USB drives. Dkt. 98 ¶ 21. The court denied that motion but explained that "circumstantial evidence at trial may well warrant drawing the inference that [the plaintiffs] seek," which would make an adverse inference ruling unnecessary. Dkt. 118 ¶ 6.

The circumstantial evidence at trial supports the conclusion that Harron used the third USB drive to take confidential information belonging to the Companies. Harron did not contest that he "used USB drives to offload documents in [his] last days of employment." Harron Tr. 77. He also had "no reason to dispute" the expert testimony that he inserted USB drives on three separate occasions, one of which occurred two days *after* his last day at Metro US and the Companies. *Id.* at 79–80; *see* JX 110 at 7. As discussed in the Factual Background, Harron's recollections of the third drive evolved as the evidence for its existence increased. Taken as a whole, this evidence is sufficient to support a finding that Harron also downloaded the Companies' confidential information to the third drive.

Harron did not contest that many of the Downloaded Documents "were confidential and proprietary to Metro and its affiliates." Harron Tr. 80; *see* Harron Dep. 261–73. Harron also conceded that he was aware of the confidential nature of the documents when he downloaded them. Harron Dep. 269–70.

Harron nevertheless claimed that he did not breach his fiduciary duties by taking the Downloaded Documents because he regarded them as "artifacts . . . that [he] was

67

particularly proud of." Harron Tr. 90. Having evaluated Harron's demeanor and considered his actions in context, the court is convinced that Harron took the documents with the intent to use them in future business endeavors. They were not merely mementos that Harron might look on fondly to remind himself of his days as President of the Companies. Harron took these documents because he thought they would be useful to him in future pursuits. *See Wayman*, 2014 WL 897223, at *23 (rejecting former employee's argument that he "would copy [former employer's] files so they would be available to him, yet never use them").[26]

### iii.    The Contract Argument

Faced with a comparatively clear breach of fiduciary duty, Harron argues that the Companies cannot assert their fiduciary claim because their Operating Agreements contain the Confidentiality Provision. Delaware law generally seeks to give primacy to the law of contract by elevating contractual agreements over general tort law principles. By taking this approach, Delaware law seeks to further private ordering and enable parties to define for themselves the parameters of their rights and obligations.

One manifestation of this principle involves a specific contractual grant of authority. If a party enters into a specific agreement with a counterparty which states that the

---

[26] Harron argues that an inference of misuse is unfair because he "did not resign to work for a direct competitor." DOB at 23. That is not the only situation when documents can be misused. Harron is a smart guy. He was capable of thinking ahead and anticipating that the documents could be useful down the road, whether in his current employment in the cold-storage business or in future ventures.

counterparty can take a particular action, then the party who contractually authorized its counterparty to act cannot rely on general tort principles, including an equitable tort like breach of fiduciary duty, to pursue a claim. Doing so effectively would enable the party to take back the authority it granted.

A more nuanced manifestation of this principle involves a specific contractual prohibition on a particular type of action. If a party enters into a specific agreement with a counterparty that expressly prohibits the counterparty from taking a particular action, then the party can seek to enforce the contractual prohibition if the counterparty violates it. In this setting, however, the contractual prohibition does not necessarily preclude other causes of action that the party may have against its counterparty. The contractual prohibition must go further and state that it operates as an exclusive remedy or that it precludes other remedies. Even then, public policy may render the contractual language ineffective to preclude resort to other remedies. For example, a contractual remedial scheme, even if denominated as exclusive, cannot foreclose a party from asserting a claim for fraud based on a written representation. *See Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1057–58 (Del. Ch. 2006); *see also Online HealthNow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *11–19 (Del. Ch. Aug. 12, 2021).

These principles apply to the intersection of contract claims with fiduciary duty claims. If the contract provides the sole source of the specific prohibition, then the plaintiff only can sue in contract, because the duty only arises from the contractual relationship. *See PT China v. PT Korea LLC*, 2010 WL 761145, at *7 (Del. Ch. Feb. 26, 2010); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *4 (Del. Ch. Oct. 19, 2004). If, however, the

plaintiff also would have a claim under general fiduciary principles, then the plaintiff also can assert the claim for breach of fiduciary duty. *Solow*, 2004 WL 2694916, at \*4. The operative question "is whether there exists an independent basis for the fiduciary duty claims apart from the contractual claims, even if both are related to the same or similar conduct." *PT China*, 2010 WL 761145, at \*7. An important factor in determining whether the fiduciary claim is duplicative of the contract claim is whether the breach is "inherently a breach of fiduciary duty." *See id.* at \*7 & n.36 (cleaned up); *Solow*, 2004 WL 2694916, at \*4–5 (dismissing fiduciary claims because conduct did "not [constitute] an action that inherently would be a breach of a fiduciary duty"). Put differently, the question is whether the plaintiff could bring an independent cause of action for breach of fiduciary duty if the parties had not signed a contract. *See Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 157 (Del. 2002) (addressing issue for purposes of whether breach of fiduciary duty claim was subject to arbitration provision); *Feeley*, 62 A.2d at 656 (same).

One consequence of this approach is that a fiduciary can face both a claim for breach of contract and a claim for breach of fiduciary duty. As the Restatement of Agency explains,

> The overlap between duties derived from tort law and from an agent's contract with the principal will often provide the principal with alternative remedies when a breach of duty subjects the agent to liability. In particular, an agent is subject to liability to the principal for all harm, whether past, present, or prospective, caused the principal by the agent's breach of the duties stated in this section.

Restatement of Agency, *supra*, § 8.08 cmt. b.

70

A fiduciary breaches its duty of loyalty by "improperly using confidential information . . . to advance [its] own personal interests and not those of" its beneficiary. *Hollinger*, 844 A.2d at 1061–62. The misuse of confidential information is "inherently a breach of fiduciary duty." *See PT China*, 2010 WL 761145, at \*7 & n.36. Even if the Operating Agreements did not contain the Confidentiality Provision, the Companies would be able to sue Harron for breach of fiduciary duty based on this misuse of confidential information. The Companies accordingly have an independent basis for the fiduciary duty claim, and they can assert it notwithstanding the existence of the Confidentiality Provision.

### 4. The Remedy

To obtain a meaningful remedy for a breach of duty, a plaintiff must establish by a preponderance of the evidence either that the plaintiff suffered harm or that the fiduciary wrongfully received a benefit.[27] A plaintiff also must prove by a preponderance of the evidence that a sufficient causal linkage exists between the breach of duty and the remedy sought to make the remedy an apt means of addressing the breach.[28]

---

[27] *See Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011) ("[I]t is inequitable to permit the fiduciary to profit from using confidential corporate information. Even if the corporation did not suffer actual harm, equity requires disgorgement of that profit."); Doug Rendleman, *Measurement of Restitution: Coordinating Restitution with Compensatory Damages and Punitive Damages*, 68 Wash. & Lee L. Rev. 973, 990 (2011) ("Actual harm to the corporation is not . . . a prerequisite for a plaintiff to state a claim for restitution-disgorgement.").

[28] *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773, 775 (Del. 2006) (explaining that when seeking post-closing damages for breach of fiduciary duty based on false or misleading disclosures, plaintiff must prove a causal link between disclosure violation and quantifiable damages); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at \*20 (Del. Ch. July 21, 2017) (finding transaction was entirely fair where

Although the plaintiff must make both showings by a preponderance of the evidence, plaintiff-friendly principles come into play. Through these principles, the proven breach of duty operates as a solvent to "loosen [the] normally stringent requirements of causation and damages." *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994), *quoted in Thorpe by Castleman v. CERBCO, Inc.* (*Thorpe II*), 676 A.2d 436, 445 (Del. 1996).

One plaintiff-friendly principle is the maxim that "once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer." *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993) (Allen, C.), *aff'd in pertinent part, rev'd in part on other grounds*, *Thorpe II*, 676 A.2d 436 (Del. 1996). Another is the proposition that "the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe II*, 676 A.2d at 445. It remains true that damages must be "logically and reasonably related to the harm or injury for which compensation is being awarded." *J.P. Morgan*, 906 A.2d at 773. But as long as that connection exists, "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack

controller engaged in acts of unfair dealing, but third party bidder intervened and severed any causal connection between controller's actions and ultimate deal price), *aff'd*, 184 A.3d 1291 (Del. 2018) (TABLE); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 314–15 (Del. Ch. 2013) ("A failure to disclose material information in [the context of a request for stockholder action] may warrant an injunction . . . but will not provide a basis for damages from defendant directors absent proof of (i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders . . . , and (iii) damages proximately caused by that failure.").

m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." *Red Sail Easter Ltd. P'rs v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992) (Allen, C.).

A proven breach of fiduciary duty also causes the remedial aperture to widen to encompass remedies other than the standard legal solution of compensatory damages. "In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief . . . ." *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000). When defendant fiduciaries have breached their duty of loyalty, the plaintiff may "demand rescission of the transaction or, if that is impractical, the payment of rescissory damages." *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991).

An appropriate remedy must take into account the requirement "that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct." *Thorpe II*, 676 A.2d at 445. That requirement means that a beneficiary can force a fiduciary to disgorge the benefits that the fiduciary received without a showing of harm to the beneficiary. *See Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011); *Oberly*, 592 A.2d at 463.

In this case, the plaintiffs sought a remedy consisting of (1) damages equal to the plaintiffs' lost investment in Metro International and the salary and benefits paid to Harron and (2) disgorgement of the consulting fees that Harron received. POB at 51, 57. The plaintiffs failed to prove that the entirety of their chosen remedy was sufficiently connected to Harron's breach. Instead, the plaintiffs are entitled to (1) disgorgement of the fees Harron

73

earned in his outside consulting including prejudgment interest thereon, and (2) the attorneys' fees and expenses that they incurred pursuing the breach of fiduciary duty claim.

### a. Damages Equal To What Metro International Could Have Been

The plaintiffs seek damages of $5.3 million to $8.8 million, equal to what they describe as the lost opportunity to invest in a successful self-storage business in Brazil. They effectively seek damages equal to what Metro International could have been if everything had gone as planned. They claim that Harron deprived the plaintiffs of the chance to achieve this value, and hence as a faithless fiduciary, he should bear the loss. Such an award is too speculative to grant, and it would be disproportionate and inequitable.

To derive an estimate of what a successful investment in Metro International might have been worth, the plaintiffs' expert added up the amount that the Nagel brothers contributed to Metro International to support MetroFit, including Harron's compensation. The expert then calculated an anticipated rate of return, using the figures in the Targeted Returns Email, and assumed an exit in 2020. POB at 56–57; JX 107 at 18. For the court to award this measure of damages, the estimate of what Metro International could have been worth would need to be reasonable, and the plaintiffs needed to prove by a preponderance of the evidence that Harron's breaches of duty caused MetroFit's collapse. The plaintiffs did not carry their burden of proof on either issue.

The plaintiffs' damages calculation used the rates of return described in the Targeted Returns Email as a high-level means of projecting the profits from a startup business. Delaware courts regularly refuse to award damages based on the lost profits from a new business, deeming evidence of lost profits to be too speculative, uncertain, and remote

when there is no history of prior profits.[29] MetroFit was a speculative startup venture. A simplistic calculation that starts with the amount of capital that the Nagel brothers invested and assumes that it generates returns identified in the Targeted Returns Email does not provide a sufficiently reliable means of estimating what Metro International might have been worth.

The plaintiffs also failed to show that Harron's extracurricular activities caused MetroFit to fail. As proof, the plaintiffs relied on testimony from Matthew and Gallagher about the critical role Harron was expected to play at Metro International and MetroFit. In response, Harron protested that he only had a "supervisory role." Harron Tr. 106.

The reality lies somewhere in between. As a starting point, the business model that Harron and the Nagel brothers were pursuing bore a high-level resemblance to a private equity fund that makes significant investments in portfolio companies. Metro International was the fund-level entity. Metro Brazil was the special purpose vehicle for the investment in a Brazilian business. MetroFit was the portfolio company in Brazil.

Using this analogy helps frame Harron's role. As President of Metro International and Metro Brazil, Harron was acting at the investor level. As a representative of the 30% investor, Harron served on the board of managers of the operating company, but he was

---

[29] *See In re Heizer Corp.*, 1990 WL 70994, at *3 (Del. Ch. May 25, 1990) (declining to award lost profits for a "'start-up' company whose ability to generate profits, in any amount, was entirely speculative"). *Compare Re v. Gannett Co.*, 480 A.2d 662, 668 (Del. Super. 1984) (stating general rule), *aff'd*, 496 A.2d 553 (Del. 1985), *with Mobile Diagnostics, Inc. v. Lindell Radiology, P.A.*, 1985 WL 189018, at *4 (Del. Super. July 29, 1985) (explaining that rule is not absolute).

not an executive of the operating company and not part of the day-to-day management team. MetroFit had its own CEO and management team. Harron was not part of the executive team that was directly responsible for the day-to-day business.

The extent to which investor representatives involve themselves in portfolio companies falls along a range. Harron was supposed to be a hands-on representative who provided extensive support and guidance to the management team running MetroFit. As Harron admitted, he was supposed to be "the linchpin between the operational know-how of Metro [US] and what we were trying to create in Brazil." *Id.* at 107. The need for Harron to be involved with MetroFit was particularly significant because it was a startup business, rather than an established operation.

The same general structure existed with Metro LATAM. There, however, Metro LATAM invested into an existing self-storage business. There was less need for hands-on involvement from the investor representative, although having that hands-on involvement could have been valuable.

Matthew generally agreed with the distinction between Harron's role at the investor level and the management team running the operating companies, but he also stressed his expectation that Harron would be a hands-on representative:

> [Harron] [is] right . . . that there was Hans [Scholl], who was the CEO of MetroFit, and we had Federico, which is the CEO of Mr. Bodeguitas, but . . . . [Harron] was really in the weeds with them, especially in Brazil, because we were creating from the ground up this company, so he would be talking to them . . . a lot about their operations and then asking us back in the home office how we do this, how we do that, how do we structure things.
>
> So . . . he was in the weeds. It was not like just some guy sitting on a board . . . we're making an investment. This was hands-on. That's why they wanted

76

us. We were not just some investor. We were in the weeds taking all of our information and all the expertise that we had and bringing it down, and so [Harron] was incredibly involved in all that, and that was his role. That was his specific role.

Matthew Tr. 206–07.

From the record, three things are clear. First, Harron was not primarily responsible for the success of the portfolio companies. The portfolio company management teams had that responsibility.

Second, Harron was expected to play an active role in supporting, advising, and overseeing the portfolio company management teams, particularly for MetroFit. He was supposed to be involved in the operations, and he knew that.

Third, Harron did not play a hands-on, operational role. He did not travel regularly to Brazil. He did not ensure that MetroFit had financial reporting systems in place. He did not provide operational guidance or insist on things like an operating manual for each store.

One reason for Harron's failure to play an operational role is that he was not well suited for it. Harron is a deal guy. During his years at Equity International and when working for himself, Harron tried to put together transactions. He does not appear to have had any experience overseeing an operating company, and he did not try to learn. He seems to have been relatively uninterested in the nuts and bolts of the business.

Another reason for Harron's failure to play an operational role was that he decided to do what he liked to do, which was pursue deals. He spent time pursuing new deals for the Companies, and he spent time pursuing deals for Gouveia and his associates. The

plaintiffs admit that pursuing deals was part of Harron's job. Harron spent time on the part of his job that he liked rather than the part of his job that he disliked.

This decision has found that Harron breached his duty of loyalty by not devoting his full time to the Companies, but because Harron did not like the operational role and was not good at it, there is considerable uncertainty about whether he could have made the Companies better by devoting more time to them. The more likely outcome is that his greater involvement would not have helped on the operational side.

The primary cause of MetroFit's failure seems to have been ineffective local management and Goldman's reluctance to fund new facilities in the teeth of the Brazilian recession. It is fair to add Harron's decreased involvement and his operational ineffectiveness to the list, but only as a contributing factor, not as a predominant factor. One can spin-out speculative stories about a heroic investor representative pushing to replace local management, reassuring Goldman or finding a new source of capital, then guiding the new local management team to success. But navigating that obstacle course would have required top-tier business talent. Even if Harron had been fully engaged, I do not think he could have pulled it off. Harron was not the general for that particular war.

The plaintiffs failed to convince me that a sufficient causal connection exists between Harron's failures and MetroFit's demise to require Harron to pay between $5.3 and $8.8 million in damages. A remedy of that magnitude would be speculative, disproportionate, and inequitable.

### b. Damages Based on Harron's Compensation

As part of their request for damages based on their investment in Metro International, the plaintiffs included Harron's salary and benefits. POB at 56–57; *see* JX 107 at 18. A damages award that incorporated the disgorgement of some measure of Harron's compensation would provide a proportionate alternative and is part of a suitable remedy for Harron's breach. Because of how the Nagel brothers structured their entities and their relationship with Harron, however, this remedy is unavailable.

As a matter of blackletter law, "[a]n agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty." Restatement (Second) of Agency, *supra*, § 469. "[I]f such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned." *Id.* Other hornbook sources agree.[30] Cases

---

[30] *See* 5A Fletcher Cyc. L. Corps., *Forfeiture of Right to Executive Compensation for Misconduct, Neglect, Fraud, or Waiver* § 2145, Westlaw (database updated Sept. 2021) (stating that as part of the "general law of agency," a "corporate officer is not entitled to compensation for services during a period in which that officer engages in activities constituting a breach of the duty of loyalty to the corporation"); *accord* 2A C.J.S. *Disloyalty* § 340, Westlaw (databased updated Mar. 2022) ("An agent may lose the right to compensation, either in whole or in part, by disloyalty towards the principal."); 30 C.J.S. *Deductions for Misconduct or Disloyalty* § 189, Westlaw (database updated Mar. 2022) ("An employee's breach of the fiduciary duty of loyalty may entitle the employer to forfeiture of all salaries and commissions earned during the time period of the disloyalty."); 19 Williston on Contracts, *Right of Defaulting or Discharged Employee to Compensation* § 54:50 (4th ed.), Westlaw (database updated Nov. 2021) ("[A]n agent is entitled to no compensation for willful and deliberate conduct that is disobedient or a breach of the duty of loyalty even for properly performed services for which no compensation is apportioned.").

from other jurisdictions also articulate this rule.[31]

Although the common law rule contemplates disgorgement of all compensation, a court may permit a disloyal agent to limit the repayment to only a "portion of [the agent's] compensation" if the agent proves "the value of [the agent's] services." *Chelsea Indust., Inc. v. Gaffney*, 449 N.E.2d 320, 327 (Mass. 1983). The Restatement (Second) of Agency explains that although an agent who engages in a "serious violation of a duty of loyalty . . . thereby loses his right to obtain compensation for prior services," that rule applies to compensation "which has not been apportioned." Restatement (Second) of Agency, *supra*, § 469 cmt. b. Elsewhere, the Restatement explains that "[i]f an agent is paid a salary apportioned to periods of time, or compensation apportioned to the completion of specified

---

[31] *See Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 229 (2d Cir. 2020) ("[O]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." (cleaned up)); *W. Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, 870 F.3d 774, 787 (8th Cir. 2017) ("An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty." (cleaned up)); *Bos. Child.'s Heart Found., Inc. v. Nadal-Ginard*, 73 F.3d 429, 435 (1st Cir. 1996) (stating the "baseline proposition that a court can require a corporate officer, director, or trust agent or employee to forfeit the right to retain or receive his or her compensation for conduct in violation of his or her fiduciary duties"); *Wilshire Oil Co. of Tex. v. Riffe*, 406 F.2d 1061, 1062 (10th Cir. 1969) ("When a corporate officer engages in activities which constitute a breach of his duty of loyalty . . ., he is not entitled to compensation for services during such a period of time although part of his services may have been properly performed." (citing Restatement (Second) of Agency, *supra*, § 469)); *Futch v. McAllister Towing of Georgetown, Inc.*, 518 S.E.2d 591, 596 (S.C. 1999) ("The general rule is that an employee is not entitled to any compensation for services performed during the period he engaged in activities constituting a breach of his duty of loyalty even though part of those services may have been properly performed." (cleaned up)); *Cogan v. Kidder, Mathews & Segner, Inc.*, 648 P.2d 875, 880 (Wa. 1982) (en banc) ("[T]he rule is designed to prevent agents from assuming conflicting responsibilities unless the principal consents upon full disclosure.").

items of work, he is entitled to receive the stipulated compensation for periods or items properly completed." *Id.* § 456 cmt. b; *see Musico v. Champion Credit Corp.*, 764 F.2d 102, 113 (2d Cir. 1985) (noting the "trend toward the position taken in the [Restatement of Agency], which calls for apportioning forfeitures when an agent's compensation is allocated to periods of time or to the completion of specified items of work"). Thus, even if an agent breached the duty of loyalty, the agent "could still recover compensation for services properly rendered during periods in which no such breach occurred and for which compensation is apportioned in [the agent's] employment agreement." *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 500 (Col. 1989) (en banc) (citing *Musico*, 764 F.2d at 112–14; Restatement (Second) of Agency, *supra*, §§ 456, 469).[32]

---

[32] A handful of decisions from this court have departed from the blackletter rule. In the original case, the employer sought to recover a disloyal employee's compensation under a theory of conversion, rather than blackletter agency principles. *See Triton Const.*, 2009 WL 1387115, at *23–24. The court rejected that theory on multiple grounds, including that there was no evidence that the employee "failed to perform his duties diligently, competently, or with due care." *Id.* at *24. Having found that the employer "got what it paid for," the court held that "[a] superior right to the compensation does not arise because [the employer] with the benefit of hindsight challenges [the employee's] disloyal acts." *Id.* That, however, is precisely what the Restatement of Agency envisions.

This court subsequently relied on *Triton*'s analysis of a conversion claim to rule on a breach of fiduciary duty claim. *See Seibold v. Camulos P'rs LP*, 2012 WL 4076182, at *25 n.250 (Del. Ch. Sept. 17, 2012). An investment fund manager proved that one of its senior analysts had used a relatively small portion of his time as an employee to prepare to depart and form a competing fund. As part of his preparations, he took a large number of fund-related documents, some of which were confidential and proprietary. The fund manager sought to force the analyst to disgorge his entire salary for the year in which he engaged in preparations as well as his bonus for the prior year. In seeking this relief, the fund manager appears only to have relied on the Delaware cases addressing disgorgement. After discussing precedents stating that disgorgement is only generally available when a fiduciary receives an improper benefit, the court relied on those principles to state that

81

Harron's disloyalty spanned the entirety of his time at the Companies. Even during the first six months of his employment, when Harron was permitted to complete his existing engagements but not to take on new ones, Harron took on the Tremont Engagement. He also was committed to and made no effort to wrap up the Cold-Storage Engagement, which turned into a multi-year project. Consistent with the Restatement of Agency, an appropriate remedy would include disgorgement of at least some, if not all, of Harron's compensation.

---

disgorgement of compensation would be available only if the analyst's "misconduct somehow unfairly increased his compensation, such as could occur if an investment manager falsely recorded gains on his positions and pumped up his resulting performance-based bonus." *Id.* at \*25. The court found that the analyst had earned his compensation and refused to order disgorgement. *Id.* at \*26. Although the decision cited the Restatement of Agency for other propositions, the opinion did not refer to the rule governing disgorgement of a disloyal agent's compensation.

Most recently, this court addressed a corporation's request to force its president to disgorge his salary after demonstrating that he spent 10-20 hours per week on a personal side business. *Avande, Inc. v. Evans*, 2019 WL 3800168, at \*18 (Del. Ch. Aug. 13, 2019). The decision did not discuss the Restatement of Agency or the rule regarding a disloyal agent's disgorgement of compensation. The court instead framed the rule as stated in *Seibold* and found no basis for disgorgement. The court observed that the corporation previously had been an LLC, that its operating agreement had authorized its managers to engage in personal business, and that the practice continued after the conversion to corporate form with the knowledge of the other principals. The court also found that the manager was working a forty hour week for the corporation in addition to spending time on his side business. *Id.* at \*18. As in *Triton* and *Seibold*, the court viewed the employer as having received the performance that the employer paid for, ending the matter.

This line of decisions should not be read as rejecting the blackletter rule found in the Restatement of Agency. None of the decisions engaged with the blackletter rule. One case viewed the conduct through the lens of conversion, and the other two applied more generalized rules for disgorgement to factually weak scenarios. The cases are better read as demonstrating that a court need not order disgorgement if the facts would render the remedy inequitable. The decisions thus illustrate the ability of a court of equity to tailor a blackletter rule to the specifics of a given case.

On the facts of this case, however, the court will not award that remedy. For reasons that the record does not reveal, the Nagel brothers employed Harron through Metro US. The Employment Agreement is a contract between Harron and Metro US, and Metro US paid Harron's compensation. Metro US, however, is not a party to the case, and the plaintiffs studiously eschewed asserting any claims under the Employment Agreement. Harron believes they did so tactically because the Employment Agreement contains an arbitration provision, and for whatever reason, the plaintiffs did not want to pursue claims against Harron in an arbitral forum.

Whatever the reasons, this is not a case in which the Companies compensated Harron such that it is a straightforward matter to order Harron to disgorge some or all of the compensation he received from the Companies as a remedy for his disloyal conduct. There might have been some way for the plaintiffs to navigate the entity labyrinth that they created. It appears that the Companies were obligated to reimburse Metro US for the compensation that Metro US paid to Harron, so there might have been a path for equity to follow in ordering that remedy. But the plaintiffs did not prioritize the disgorgement of Harron's compensation. They instead went for a home run recovery involving everything they invested in Metro International, including Harron's compensation. This decision has rejected that measure of damages. "[A]s is often the case when one swings for the fences," the plaintiffs "failed to make contact altogether." *Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, 2021 WL 2886188, at *26 n.244 (Del. Ch. July 9, 2021).

Although the court believes that disgorgement of at least some portion of Harron's compensation would be warranted under the circumstances, the court will not award that

83

remedy. The Nagel brothers presumably believed that there were considerable benefits to the entity structure that they created. They must now live with one of its costs.

### c. Disgorgement Of Harron's Consulting Fees

The plaintiffs also seek disgorgement of the consulting fees that Harron earned. That is an appropriate component of a remedy for Harron's breach of fiduciary duty.

Under blackletter principles of agency law, "[i]f an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal." Restatement (Second) of Agency, *supra*, § 403 . That rule tracks the general fiduciary principle that when a fiduciary engages in "acts of conscious wrongdoing and breaches of a fiduciary duty of loyalty," the wrongdoer must "disgorge any profit made as a result of such wrongful conduct." *Pike v. Commodore Motel Corp.*, 1986 WL 13007, at *3 (Del. Ch. Nov. 14, 1986), *aff'd*, 529 A.2d 772 (TABLE).

"The object of the disgorgement remedy—to remove the possibility of profit from conscious wrongdoing—is one of the cornerstones of the law of restitution and unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. e (Am. L. Inst., Tentative Draft No. 5, 2007), Westlaw (database updated Oct. 2021) [hereinafter Restatement of Restitution]. The Delaware Supreme Court has expressed similar sentiments, explaining that the rule against personal profits rests on "a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation." *Guth*, 5 A.2d at 510.

"The profit for which the wrongdoer is liable . . . is the net increase in the assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong." Restatement of Restitution, *supra*, § 51 cmt. e. The plaintiff bears the "burden of producing evidence from which the court may make at least a reasonable approximation of the defendant's" improper benefit. *Id.* "If the claimant's evidence will not yield even a reasonable approximation . . . disgorgement will not be allowed." *Id.* "[T]he conscious wrongdoer bears the risk of uncertainty arising from the wrong." *Id.*[33]

The proper measure of disgorgement in this case is the fees Harron earned from his outside consulting work. They represent the increase in Harron's assets that resulted from his fiduciary breaches.

Harron has represented that he earned $515,151 for this outside consulting work. *See* JX 102. If anything, that amount is likely low.

The only evidence for the amount of consulting fees that Harron received is a sheet titled "Harron Fee Disclosure," which Harron created for purposes of this litigation. PTO ¶ 64. Harron created the disclosure himself by reviewing his Citibank statements. He

---

[33] *See Gratz v. Claughton*, 187 F.2d 46, 51–52 (2d Cir. 1951) (L. Hand, J.) ("The situation falls within the doctrine which has been law since the days of the 'Chimney Sweeper's Jewel Case,' that when damages are at some unascertainable amount below an upper limit and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount." (footnotes omitted)); *Armory v. Delamirie* (1722) 93 Eng. Rep. 664 (KB) (the "Chimney Sweeper's Jewel Case," which stated that "the Chief Justice directed the jury, that unless the defendant did produce the jewel, and it not to be of the finest water, they should presume the strongest against him, and make the value of the best jewels the measure of their damages; which they accordingly did.").

testified that he did not keep a spreadsheet or other record of the fees he generated. *See* Harron Dep. 42–43. The plaintiffs' damages expert observed that Harron "produced only 15 unique monthly Citibank statements scattered over a 73-month period, with the majority of each statement redacted." JX 107 at 9–10. He also explained that the "unredacted portions of the bank statements reveal only *selected* deposits into a 'High Interest Checking' account." *Id.* at 10. "[T]he redactions also hid the 'Amount Added' columns . . . so one cannot affirmatively state that the unredacted portions cover all deposits into the High Interest Checking account." *Id.* And Harron redacted "all activity for 'Insured Money Market Accounts' and three 'Other Accounts.'" *Id.* In the limited account information that Harron provided, "there was over half a million dollars in transfers from [Harron's] IMMA and PMMA account into his high-interest checking account. How . . . that half a million dollars was funded in those two other accounts, we don't know." Margolin Tr. 414–15. Harron's tax returns offered no assistance in corroborating the Harron Fee Disclosure, because they "appear to omit 65% of the Harron Fee Disclosure payments." JX 107 at 11.

The Harron Fee Disclosure also omits known engagements. *Id.* at 12–14. For example, for the Tremont Engagement, Spire agreed to pay Harron $10,000 per month for a period of three months. JX 1 at 5. Those payments are not reflected in the Harron Fee Disclosure. JX 107 at 13. Likewise, for the Black Rose Engagement, Spire agreed to pay Harron $5,000 per month for six months. JX 22 at 5. The Harron Fee Disclosure only reflects four months of payments, one of which fell outside the six-month period of the engagement. JX 107 at 14. The Harron Fee Disclosure is thus missing at least two

payments, and the fourth payment suggests that the Black Rose Engagement may have continued for more than six months.

Notwithstanding these issues, the evidentiary record only supports disgorgement of consulting fees in the amount of $515,151. The Companies are awarded that amount. The remedy for any amounts that Harron received before the creation of Metro LATAM will go to Metro International. After the creation of Metro LATAM, the Companies will split any recoveries equally.

### d. Pre-Judgment Interest

"A successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues." *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988). The plaintiffs are entitled to pre-judgment interest on the foregoing amounts at the legal rate, compounded quarterly, using the rates in effect at each compounding interval. Interest on each payment will run from the date when it was made.

Harron argues that the plaintiffs waived their right to receive pre- and post-judgment interest by not expressly asking for it in their posttrial brief. DOB at 41. The plaintiffs did not have to ask for pre-judgment interest expressly because it is available as a matter of right and regularly calculated as part of the preparation of the final order, after the court has ruled.

### e. Fee Shifting

The plaintiffs seek to recover the attorneys' fees and expenses that they incurred as a result of Harron's breaches of duty. "Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own

87

attorneys' fees, whatever the outcome of litigation." *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 545 (Del. 1998). But there are exceptions to the rule, including for situations where a fiduciary has engaged in an "egregious breach of the duty of loyalty," but the harm flowing from the breach was "not readily capable of quantification." *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001). The Delaware Supreme Court has upheld an award of attorneys' fees and expenses as a component of a damages award for a breach of the duty of loyalty, noting that "[t]he Court of Chancery has broad discretionary power to fashion appropriate relief." *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011).

Harron engaged in an egregious breach of his duty of loyalty. He knew his conduct was wrong. He did it anyway, and it persisted for years. During that period, Harron kept his actions secret. Then, at the conclusion of his employment, he attempted to take confidential documents. Matthew only discovered Harron's actions by chance. Harron almost got away with it. As this decision has shown, it is difficult to quantify an appropriate remedy for Harron's breaches of duty. Harron's conduct likely contributed to some degree to the failure of MetroFit, but it would be disproportionate and inequitable to award the plaintiffs damages equivalent to a successful venture.

This is a case where fee-shifting is appropriate as a component of the damages remedy necessary to make the plaintiffs whole. The Companies are entitled to the fees and expenses that they incurred to pursue the claim for breach of fiduciary duty.

## 5. Exculpation

Under the Exculpation Provision, Harron only can be liable for money damages that result from fraud, gross negligence, or willful misconduct. Although each exception to exculpation could apply, the analysis can start and end with the exception for willful misconduct.

To find that an act constituted "willful misconduct," there must be "a showing of 'intentional wrongdoing, not mere negligence, gross negligence or recklessness.'" *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2021 WL 5267734, at \*79 (Del. Ch. Nov. 12, 2021) (quoting *Dieckman v. Regency GP LP*, 2021 WL 537325, at \*31 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. Nov. 3, 2021) (TABLE)); *see Willful Misconduct*, Black's Law Dictionary (11th ed. 2019) ("Misconduct committed voluntarily and intentionally.").

As this decision has explained, Harron acted willfully. He knew what his obligations were, and he intentionally disregarded them. The exculpatory provision therefore does not apply.

## B. Breach Of The Confidentiality Provision

In their second broad claim, the plaintiffs sought to prove that Harron breached the Confidentiality Provision in the Operating Agreements. That provision states:

> Each of the Members understands and acknowledges that: (i) as a result of the commencement and operation of the Company's business and the transactions contemplated in this Agreement, each of them may become informed of, and have access to, confidential information regarding customers, business plans, inventions, designs, trade secrets, technical information, plans and other information respecting the Company's business (collectively, "Confidential Information"); and (ii) all such Confidential

Information shall be held by him, her or it in trust and shall not be disclosed to anyone other than their respective directors, officers, agents, employees and representatives who have a need to know, and all of whom have been made aware of their obligations to maintain confidentiality under this Section, nor shall such Confidential Information be used for any purposes that is not consistent with the Company's benefit.

IOA § 19.11; *accord* LOA § 19.11.

The plaintiffs proved that Harron breached the Confidentiality Provision by disclosing the Shared Information and taking the Downloaded Documents. Harron concedes the underlying facts. To avoid liability, he offers four contrived arguments.

## 1. Standing

For starters, Harron argues that the Companies cannot sue for breach of the Confidentiality Provision because the Shared Information belonged to MetroFit, and the Confidentiality Provision does not extend to MetroFit's information. DOB at 13. Under Harron's theory, the "Company" in the International Operating Agreement means only Metro International, and the same is true for Metro LATAM under the LATAM Operating Agreement. Because MetroFit is a separate entity, Harron argues that the Confidentiality Provision therefore does not extend to information belonging to MetroFit. Harron concludes that the "[p]laintiffs lack standing to assert a claim over that information." *Id.*

To have standing, a plaintiff "must demonstrate . . . that he or she sustained an 'injury in fact.'" *Dover Hist. Soc. v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003). "An injury in fact is 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *AlixPartners, LLP v. Mori*, 2019 WL 6327325, at *9 (Del. Ch. Nov. 26, 2019) (quoting

*Dover Hist.*, 838 A.2d at 1110)).

Under these principles, the Companies have standing to bring the claim for breach of the Confidentiality Provision if they have suffered an injury in fact. "Confidential information compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit." 1 Fletcher Cyclopedia L. Corps. § 31, Westlaw (database updated Sept. 2021). Generally, "a parent corporation does not, by reason of owning the stock of a subsidiary alone, own or have legal title to the assets of the subsidiary." *Id.* § 26. Thus, under the general rule, a parent does not have a claim for improper disclosure of confidential information belonging to a subsidiary. By the same token, an affiliated corporation does not have a claim for improper disclosure of the affiliate's confidential information. What these simple rule statements fail to acknowledge is that multiple entities can have interests in information, and an entity has standing to sue if it has an interest in the confidential information. *See AlixPartners*, 2019 WL 6327325, at *9.

In this case, Harron conceded that the Shared Information fell within the scope of the Confidentiality Provision. *See, e.g.*, Harron Tr. 70 (Q: "And this document would fall squarely within the provision of . . . [Metro International's] [C]onfidentiality [P]rovision. You would agree with that, wouldn't you?" A: "I would, yes."). That is the end of the issue.

Regardless, the record demonstrates that the Shared Information did not belong only to MetroFit. Three of the emails related to the Goldman Transaction. *See* JX 43; JXs 47–48. The information about the Goldman Transaction resulted from "lengthy" negotiations

that Harron admitted he pursued "on behalf of [Metro International]."[34] Because Harron negotiated the Goldman Transaction as a representative of Metro International, the information resulting from the negotiations was the property of Metro International. Harron likely acted on behalf of MetroFit as well, so MetroFit also likely had an ownership interest in the information. MetroFit's additional interest does not prevent Metro International from having the ownership interest necessary to sue.

The fourth email in the set is the Targeted Returns Email. The contents of that email plainly constituted information belonging to Metro International and Metro LATAM. The email stated that "in the US, we shoot for 8% to 9%. I would say 18 months ago, we were closer to 9% but now, closer to 8% given rising construction costs and land acquisition costs. In LATAM, it's better. I would say in Central America we can get 10–12%. Brazil, we're shooting for higher—like 13–15%." JX 31 at 1. In his deposition, Harron conceded that he was speaking for Metro International when he sent this email from his Metro International email account. *See* Harron Dep. 182, 184, 186. He also plainly was sharing information belonging to Metro LATAM.

Both Companies therefore have standing to pursue a claim for breach of the Confidentiality Provision.

---

[34] Harron Tr. 68; *see id.* at 65 (agreeing that the Control Rights Email "listed specific elements negotiated with Goldman related to the deal that [Metro International] and MetroFit has with Goldman"); Ex. 25 at 1 (confidentiality agreement between Goldman and Metro International executed "[i]n connection with the discussions between [Metro International] and/or MetroFit . . . and Goldman . . . relating to a potential investment in self storage assets located in Brazil").

**2.      Whether The Information Was General Non-Confidential Information.**

Harron next argues that the information he shared was "general non-confidential information." DOB at 15. The extent of Harron's argument is limited to six words: "the information is general non-confidential information." *See id.*

Although Harron made no effort to spell out what he meant, he appears to be alluding to the following recognized concept in employment law: Confidential information does not encompass "[a]n employee's general knowledge and skills and any increase in knowledge and skills the employee obtains in the ordinary course of employment," such as "knowledge about the habits and preferences of particular customers or other persons." Restatement of Employment Law § 8.02 cmt. e (Am. L. Inst. Tentative Draft No. 3, 2010), Westlaw (database updated Mar. 2022). Confidential information also does not include information that is "generally known to the public or in the employer's industry." *Id.* § 8.02(b); *see id.* cmt. d. An employee can share these types of information without breaching the employee's duty of loyalty to the employer. *See id.* §§ 8.02–.03.

Harron's six words thus seem to be an attempt to assert that the Shared Information was part of his general knowledge and skills. That argument is such a stretch that it makes sense that Harron devoted only six words to it. Harron disclosed specific information about Metro International and Metro LATAM's deals and investment returns. The information qualified as Confidential Information within the meaning of the Confidentiality Provision. Harron admitted that fact. *See* Harron Tr. 70

### 3. The Role Of The Metro US Network

Third, Harron argued that the Companies waived any claim that the Shared Information was confidential by storing it on a network maintained by Metro US. DOB at 15. Harron tries to suggest that because the Companies did not store the information on servers that they owned, the information was no longer confidential.

The Companies were parties to a shared services agreement with Metro US (the "Services Agreement"). Gallagher Tr. 298–99, 353. The International Operating Agreement referenced this agreement, which it defined as "an agreement between the Company (or any Metro International Entity) and [Metro US] for property management, development, construction and/or leasing or other services to be provided by [Metro US] to the Company or to a Metro International Entity." IOA § 1, at 3. Under that agreement, Metro US provided all of the administrative services to Metro International, including IT systems and support. Gallagher Tr. 298. That in turn meant that all of Metro International's information was stored on Metro US's network. *Id.*

When storing the Companies' email, Metro US acted as the Companies' agent. *See* Restatement of Agency, *supra*, § 1.01. Metro US therefore had an obligation to keep the Companies' email confidential, just as Harron did. Because Metro US was bound to keep the information confidential, sharing the information with Metro US by having Metro US provide hosting services did not result in waiver. No one should be surprised by this result.

94

The situation is no different than when a lawyer contracts with a services provider to provide email services or to maintain confidential documents in the cloud.[35]

### 4. Damages

Finally, Harron argues that the plaintiffs fail to prove actual damages. DOB at 16. The plaintiffs did not seek monetary damages for the breach of the Confidentiality Provision. Instead, the plaintiffs sought "an injunction and a return or destruction of" any Confidential Information still in Harron's possession. Dkt. 132 at 6.

### 5. The Remedy

The plaintiffs seek a permanent injunction. Therefore, they must demonstrate "(1) actual success on the merits; (2) irreparable harm, and (3) [that] the harm resulting from a failure to issue an injunction outweighs the harm to the opposing party if the court issues the injunction." *Agilient Techs., Inc. v. Kirkland*, 2010 WL 610725, at *31 (Del. Ch. Feb. 18, 2010) (cleaned up).

---

[35] *See* Brian S. Legum, *Cloud Computing 101*, J. Del. State Bar Ass'n, at 12–13 (Oct. 2014) (explaining that storing privileged documents on "the cloud," which includes services such as "Gmail, Yahoo!, Hotmail, or AOL Mail . . . [and] Google Docs, Microsoft 365, or Dropbox," does not necessarily lead to privilege waiver, and listing best practices for attorneys utilizing these services); *see also* Karen Painter Randell, *The Ethics of Cloud-Based Storage*, Am. Bar Ass'n (Jan. 31, 2017), https://www.americanbar.org/groups/litigation/committees/professional-liability/practice/2017/the-ethics-of-cloud-based-storage/ (noting that the "American Bar Association did not disapprove of cloud-based storage," but advising that "law practices using third-party storage services are cautioned to carefully consider safety mechanisms offered by potential providers, as well as their ethical obligations, before entering into any services agreements").

All of the requirements are met. As discussed above, the plaintiffs have proven that Harron breached the Confidentiality Provision. The plaintiffs also established irreparable harm by proving a breach of the Confidentiality Provision.[36] The third element requires a balancing of the equities. Harron freely admitted that he disclosed the Shared Information. Harron admittedly knew that the Shared Information was confidential and not to be shared. *See* Harron Tr. 62–70. Harron had no property right in the Shared Information. The balance of the equities tips decidedly in favor of a permanent injunction. The final order entered in this action will include a permanent, mandatory injunction requiring Harron to return all of the confidential and proprietary information belonging to the Companies.[37]

---

[36] *See Cabela's LLC v. Wellman*, 2018 WL 5309954, at *14 (Del. Ch. Oct. 26, 2018) (finding that a breach of a confidentiality provision subjected the plaintiff to "unfair competition and irreparable harm"); *E.I. duPont de Nemours & Co. v. Am. Potash & Chem. Corp.*, 200 A.2d 428, 431 (Del. Ch. 1964) ("[T]he law is well settled that where an employee has agreed either expressly or by implication as one of the terms of his contract of employment that he will not divulge or disclose to his employer's detriment any trade secrets or other confidential information which he has acquired in the course of his employment, the employer is entitled to an injunction against a threatened use or disclosure of such confidential information by its former employee for his own benefit or for the benefit of a third person."); *see also Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *20 (Del. Ch. Aug. 4, 2006) ("Damages would not adequately compensate [p]laintiffs . . . because the purpose of such [confidentiality] provisions is to prevent harm and misuse before it occurs.").

[37] In *Seibold*, this court denied an employer's request for a mandatory injunction requiring the employee to return all of the employer's confidential documents. 2012 WL 4076182, at *27. As noted previously, the employer was an investment fund manager that sued a senior analyst who left to form a competing fund. The court expressed frustration with both parties, describing the lawsuit as one "which seems to belie any notion that financial logic drives behavior, to the exclusion of other sentiments like hurt, anger, and resentment," and which resulted in litigation "which seems to be disproportionate to what is financially at stake." Id. at *1. After proving that the analyst took confidential information, the fund manager sought a mandatory injunction requiring the analyst "to

**C.     The Note**

In a related contractual claim, the Trusts seek to enforce a note that Harron executed in their favor when borrowing the funds sufficient to make capital contributions to the Companies. The Trusts proved that the amount of the Note is immediately due and payable.

**1.     The Origins And Terms Of The Note**

As a member of the Companies, Harron was subject to capital calls made in compliance with the Operating Agreements. Those agreements provided that Harron could meet his obligations by taking loans from the Trusts.

---

return whatever confidential information he still has on his system." *Id.* The court regarded the claim to injunctive relief as weak, because the fund manager offered no evidence that the analyst had used or disclosed any confidential information to the fund manager's detriment and the fund manager had dropped its claim for money damages, which suggested to the court "that any such information is now immaterial." *Id.* The court also criticized the fund manager for failing to identify what information the analyst still possessed that could threaten the fund manager with harm. *Id.* at *27. The court found instead that "[t]he weight of the evidence suggests that [the analyst] and his counsel made a good faith effort to identify and return the [fund manager's] information." *Id.* In lieu of the fund manager's requested injunction, the court gave the fund manager "the right to identify with specificity any information that it should be returned to it, which it believes has not yet been returned," at which point the analyst and his counsel would be obligated to ensure that they no longer possessed it. If they found the information, they were to copy it, deliver it to the fund manager, and expunge it from their systems and devices. *Id.*

The facts of this case are different. On one side of the ledger, the plaintiffs have been more measured in their pursuit of Harron. They have litigated vigorously, but not to the degree that seems to have frustrated the court in *Seibold*. On the other side of the ledger, the court lacks similar confidence in Harron, who initially did not return the Dell, subsequently denied the existence of the third USB drive, and still has not been able to find it. The proper course is to enter a mandatory injunction to ensure that if Harron finds additional confidential information belonging to the Companies, he must return it.

97

Metro International issued its first capital call in 2012. PTO ¶ 51. To pay his portion of the first Capital Call, Harron exercised his option to receive a loan from the Trusts. *Id.* The original loan had a principal balance of $5,288.68. *See* JX 38 (the "Note") Ex. A. The International Operating Agreement provided that any loan was due within five years after issuance with accrued interest to be paid annually. IOA § 8.1(b); PTO ¶ 53. In response to each subsequent capital call, Harron exercised his right to add the amounts due to the note. PTO ¶ 54. By January 1, 2017, the principal balance had reached $451,128.38. *Id.* ¶ 55.

With the five-year maturity date nearing, Harron asked for a new and longer repayment period. Harron Tr. 33. The result was a new note dated January 1, 2017. Note at 1. The Note provided that if Harron was "in default under the terms of the Operating Agreements," then he would be in "Default" under the Note. *Id.* § 7(c). In the event of a default, the Trusts could "declare [the] Note (principal, interest and other amounts) immediately due and payable without notice or demand of any kind." *Id.* § 8(a).

When Harron and the Nagels formed Metro LATAM, Harron funded his contribution of 10% of the capital through a loan from the Trusts. That loan was rolled into the Note.

Harron has not made any payments toward the Note. Harron Tr. 35. As of May 1, 2021, the outstanding balance was $1,364,900.54. JX 114 at 37.

### 2. The Personal Jurisdiction Defense

As his principal defense to this claim, Harron argues that this court "lacks personal jurisdiction to consider plaintiffs' request to accelerate the note." DOB at 48. Because personal jurisdiction is a threshold issue, the court addresses it first.

98

This court can exercise personal jurisdiction over Harron for purposes of the claim under the Note. The court previously held that Harron is subject to personal jurisdiction in Delaware under 6 *Del. C.* § 18-109(a). *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *7, *11, *27–28 (Del. Ch. July 19, 2019). The court explained that "[o]nce a defendant is subject to personal jurisdiction under 6 *Del. C.* § 18-109(a) as to certain claims, the Court may exercise personal jurisdiction over the defendant with respect to any claims that are sufficiently related to the cause of action." *Id.* at *27 (cleaned up). Applying this principle, the court held that it could exercise personal jurisdiction over Harron for the claim under the Note "because the claim to recover the loans is closely related to Harron's departure from the Companies and the plaintiffs' claims regarding his wrongful acts." *Id.*

That ruling is law of the case. To escape it, Harron observes that in its pleading stage ruling, the court understood that the Companies were the lenders, rather than the Trusts. Harron contends that because the Trusts were the lenders, that fact "undermines the Court's conclusion that [this claim] is closely related to Harron's departure from the Companies and the plaintiffs' claims regarding his wrongful acts." DOB at 50 (internal quotation marks omitted).

That argument is unpersuasive. The court's ruling focused on the fact that the "claim to recover the loans is closely related to Harron's departure from the Companies and the plaintiffs' claims regarding his wrongful acts." *See Metro Storage*, 2019 WL 3282613, at *28. Those observations remain true. The identity of the lenders does not change matters. Nor are the lenders unrelated parties. They are affiliates of the Companies and under the

99

common control of Matthew and Blair. They can sue Harron in this action to recover under the Note.[38]

### 3. The Note Is Due And Payable.

The Trusts contend that the Note is immediately due and payable because Harron is in "default" under the Operating Agreements. Section 8(a) of the Note provides that "[u]pon the occurrence and during the continuance of any Event of Default . . . Lender at its option may declare this Note (principal, interest and other amounts) immediately due and payable without notice or demand of any kind." Note § 8(a). The "events of default" include if Harron "is in default under the terms of the Operating Agreements." *Id.* § 7(c).

The parties dispute what constitutes a "default under the terms of the Operating Agreement." "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

Black's Law Dictionary defines "default" as "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." *Default*, Black's Law Dictionary (11th ed. 2019); *see Default*, Webster's Ninth New Collegiate Dictionary (1990) ("[T]o fail to fulfill a contract, agreement, or duty."). The reference to "Default" unambiguously refers to a failure to comply with the terms of the Operating Agreements.

---

[38] Harron waived any argument concerning whether the Note's forum selection clause dictates venue. *See* DOB at 50. Harron should have raised that argument, if at all, at the beginning of the case.

This decision has held that Harron breached the Confidentiality Provision. He is therefore in default. The final judgment entered in this action will provide that the Note is "immediately due and payable without notice or demand of any kind."[39] The final judgment will require Harron to pay the amount due in full satisfaction of the Note.

**D.** **The Right To Repurchase Harron's Units In Metro International**

In the next contractual claim, International Manager asserts that it can exercise an option to repurchase Harron's units in Metro International. A series of disputes exists over the exercise of the option.

The International Operating Agreement provides as follows:

After the 5th year of Executive's employment with Company, , [sic] if the Executive voluntarily terminates his employment, the Company, Metro [US] or one of its affiliates (the "Employer"), shall have the option, upon [International Manager's] exercise of such option, to purchase all (but not less than all) of the Executive's Units by paying the following percentages of the appraised value of the Executive's Units and the Units of any successor in interest to such Departing Member:

Year 6 – 20% of appraised value

Year 7 – 40% of appraised value

Year 8 – 60% of appraised value

Year 9 – 80% of appraised value

Year 10 and after – 100% of appraised value

---

[39] Because Harron's default renders the Note immediately due and payable, this decision does not reach the Trusts' argument that the court can declare the Note immediately due and payable under Section 8.1(b) of the International Operating Agreement.

101

IOA § 18.2(c) (the "International Option"). Section 18.4(c) provides that "[t]he executive

shall not be eligible to receive any value for his Units except for the return of his Capital

Contributions without any return thereon if termination is a Cause Termination or a

voluntary termination by the Executive within the first 5 years of his employment without

Good Reason." *Id.* § 18.4(c). "Cause" is defined in the Employment Agreement, and it

includes "the Executive's material breach of" the Employment Agreement.

The parties agree on some basic issues. The Executive is Harron. The Company is

Metro International. The starting date for Harron's employment with Metro International

was May 24, 2012. The ending date for Harron's employment was September 11, 2018.[40]

Beyond that, disagreements abound.

### 1. International Manager's Ability To Exercise The International Option

The first dispute concerns whether International Manager can exercise the

International Option. Section 18.3 provides that International Manager could exercise the

International Option "by written notice to the Executive at any time within 180 days after

the occurrence of the event which caused the option to become operative." IOA § 18.3.

Under the plain language of that provision, International Manager had until March 10,

---

[40] PTO ¶ 66. The parties stipulated to that date, and Harron agreed with it at trial. Harron Tr. 78 (Q: "And your last day at the company was on September 11?" A: "Correct."); Matthew Tr. 219 ("[Harron] left on September 11th. That was his last official day."). In posttrial briefing, Harron inexplicably asserted that his last day of employment was September 13, 2018. DOB at 43. For their part, the plaintiffs stated at one point that Harron's last day was September 13, 2018, and at another point that his last day was September 11, 2018. *Compare* POB at 41 n.9 *with id.* at 50. The court uses the stipulated date. A two-day discrepancy would not affect the analysis.

2019, to exercise the International Option. International Manager did not give notice that it was exercising the International Option during that period. *See* Gallagher Tr. 343. Harron argues that International Manager therefore cannot exercise the International Option.

Metro International responds that because Harron committed an antecedent breach of the International Operating Agreement, the timing requirement was excused. Under blackletter principles of contract law, "where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties of performance with respect to the expected exchange if there has already been an uncured material failure of performance by the other party." Restatement (Second) of Contracts § 237 cmt. b (Am. L. Inst. 1981), Westlaw (database updated Oct. 2021). "In determining whether there has been a failure of performance, the terms of the agreement . . . and the duty of good faith and fair dealing should be considered." *Id.* (citations omitted). The standard of materiality is "necessarily imprecise and flexible," and "is to be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." *Id.* § 241 cmt. a. The Restatement of Contracts provides examples of "circumstances . . . to be considered in determining whether a particular failure is material." *Id.* One of those circumstances is "[t]he extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Id.* cmt. f. The Restatement of Contracts characterizes that as "a significant circumstance in determining whether the failure is material," and further explains that "[i]n giving weight to this factor courts have often used such less precise terms as 'wilful.'" *Id.*

103

"Good faith performance . . . of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ." *Id.* § 205 cmt. a. "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified," and "evasion of the spirit of the bargain" and "willful rendering of imperfect performance" have been found to be "bad faith." *Id.* cmt. d; *see Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) ("Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." (cleaned up)).

While serving as a member of this court, Chief Justice Strine addressed a similar situation. *See Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 98 (Del. Ch. 2006). Eureka VII LLC ("Eureka") and Niagara Falls Holdings LLC ("Holdings") each held a 50% interest in a limited liability company ("Redevelopment"). Holdings was controlled by an individual named Edwin Cogan, and the LLC agreement "contained a number of provisions designed to ensure that Eureka would be protected if Cogan ceased to have effective control of Holdings." *Id.* at 99. After encountering financial difficulties, Cogan transferred part of his interest in Holdings to one of his creditors. Eureka did not know about the transfer to the creditor. *See id.* at 112.

Cogan subsequently triggered a buy/sell mechanism in the Redemption LLC Agreement. Under that mechanism, one member could serve the other with a notice that identified a transaction price, and the other member had to decide whether to buy or sell at

that price. In response to a notice from Holdings, Eureka decided to buy, but the transaction failed to close on time. Under a different provision of the LLC agreement, the failure to close gave Holdings the right to buy out Eureka for 10% below the transaction price. *Id.* at 103. Holdings attempted to invoke its buyout right, and litigation ensued. *Id.* at 105.

Chief Justice Strine held that Holdings could not seek a decree of specific performance enforcing its buyout right, citing three independent reasons for reaching that result. *Id.* at 117. One reason was that Holdings had committed an antecedent breach of the LLC Agreement when Cogan transferred interests in Holdings to a creditor without informing Eureka. As a result, Holdings was

> in no equitable position to claim that it was entitled to invoke the Buy/Sell Provision when it did so after it had clandestinely provided a creditor of the Cogan Trust with rights in Holdings in violation of the LLC Agreement. Put another way, once Cogan caused the Cogan Trust to grant [a creditor] the illicit security interest in Holdings, Holdings effectively deprived itself of any right to act as a member of [] Redevelopment.

*Id.* at 117; *accord id.* at 98 ("Holdings was in no equitable position to invoke the [Buy/Sell Provision], having committed a prior material breach."). *See generally Anvil Min. Co. v. Humble*, 153 U.S. 540, 552 (1894) ("Generally speaking, it is true that when a contract is not performed the party who is guilty of the first breach is the one upon whom rests all the liability for the nonperformance.").

The principles of antecedent breach apply here and prevent Harron from objecting to International Manager's otherwise untimely exercise of the International Option. By breaching the Confidentiality Provision and his fiduciary duties, Harron engaged in a clandestine breach of the International Operating Agreement. The existence of Harron's

105

breach was material information that could have caused International Manager to exercise the International Option. Because of his antecedent breach, Harron is now in no equitable position to invoke the timing requirement for the International Option.

## 2. The Exercise Price

The next dispute concerns whether International Manager can exercise the International Option and pay an exercise price as if Harron had been terminated for cause. The plaintiffs argue that in that scenario, they can repurchase Harron's units for the value of his capital account. They assert that the value of Harron's capital account is zero, and they claim that International Manager should be able to exercise the International Option for nothing. The plaintiffs misinterpret the provisions for calculating the exercise price, but they are correct that they can exercise the International Option as if Harron had been terminated for cause.

### a. The Calculation Of The Exercise Price

The first dispute concerns the calculation of the exercise price. As noted, Section 18.2 provides for the calculation of an exercise price based on a percentage of the appraised value of the Executive's units (the "Base Exercise Price"). Section 18.4(c) then provides that "[t]he executive shall not be eligible to receive any value for his Units except for the return of his Capital Contributions without any return thereon if termination is a Cause Termination or a voluntary termination by the Executive within the first 5 years of his employment without Good Reason." IOA § 18.4(c). The plaintiffs argue that under Section 18.4(c), the exercise price becomes the value of Harron's capital account at the time of the option exercise. Harron responds that Section 18.4(c) specifically refers to "the return of

106

his Capital Contributions," which he interprets to mean the value that he paid into the entity, regardless of whether the value of his capital account has decreased since then.

The International Operating Agreement defines Capital Contribution as follows:

"Capital Contribution" shall mean, with respect to any Member, the cash and fair market value (which value shall be determined in good faith by the Manager) of other property (net of any liabilities secured by any contributed property that [Metro International] is considered to take subject to or assume under Section 752 of the [Internal Revenue] Code) contributed to [Metro International] in accordance with the terms of this Agreement.

*Id.* § 1, at 2. If a member contributed $200,000 in capital to Metro International, then the value of the Capital Contribution is $200,000.

The value of a Capital Contribution is distinct from the value of a member's capital account, which rises and falls with the allocation of the entity's profits and losses and as a result of additional contributions or distributions. The International Operating Agreement defines "Capital Account" as "the capital account of a Member maintained pursuant to Section 9 hereof." *Id.* Section 18.4(c) uses the term Capital Contribution. It does not use the term Capital Account.

The plaintiffs are thus incorrect that International Manager would be able to exercise the International Option and pay the value of Harron's capital account. But Harron is also incorrect that he receives the amount of his Capital Contributions.

When read in conjunction with Section 18.2, Section 18.4(c) places a cap on the amount of consideration that the Executive can receive through the exercise price. Determining the exercise price for the International Option is a three-step process. The first step is to determine the fair market value of the Executive's units, whether by agreement

107

or appraisal. The second step is to multiply that value by a percentage tied to the length of the Executive's tenure with the Company. The third step is to apply Section 18.4(c), which provides that if the calculated value otherwise would exceed the Executive's Capital Contributions, then the exercise price is capped at the value of the Executive's Capital Contributions. If the calculated value is less than or equal to the Executive's Capital Contributions, then the exercise price remains the calculated value.

Any other reading would not be reasonable, because it would cause Section 18.4(c) to give the Executive a windfall when the purpose of that provision is to impose a penalty. In a departure from contractarian principles, the LLC Act permits an LLC agreement to impose "specified penalties or specified consequences."[41] Section 18.4(c) is designed to create a disincentive for an early departure other than for Good Cause by imposing a specified consequence and to impose a penalty in the event of a Cause Termination. In an upside scenario where the value of the Executive's units has grown to exceed his capital contributions, Section 18.4(c) accomplishes this result by capping the amount of the exercise price at the value of his capital contributions, without any return on these funds. For example, if the Base Exercise Price was $400,000 and the capital contribution was $200,000, the cap on the exercise price would be $200,000.

---

[41] *See* 6 *Del. C.* § 18-306. This is one example of the departures from contractarian principles that make LLCs not wholly creatures of contract, but rather primarily creatures of contract. Professor Mohsen Manesh has identified twelve other examples, resulting in a baker's dozen. *See* Mohsen Manesh, *Creatures of Contract: A Half-Truth About LLCs*, 42 Del. J. Corp. L. 391 (2018).

The question is what happens in a downside case, for example if the Base Exercise Price was $100,000 but the capital contribution remained $200,000. Harron's reading would cause Section 18.4(c) to operate as a floor that ensures the Executive faces no risk of loss (assuming that Metro International has the funds to pay the amount due). In the example, Harron thinks he would receive $200,000.

Parties can contract for protection against downside risk. *See Domain Assocs., L.L.C. v. Shah*, 2018 WL 3853531, *12 (Del. Ch. Aug. 13, 2018) (analyzing whether provision addressing involuntary withdrawal from LLC resulted in payment equal to value of capital account or payment equal to fair value of member interest). But Harron's reading would enable the party most directly associated with the operation of the entity to avoid sharing any of the loss in a downside scenario. That is an extreme result, and Section 18.4(c) would have to provide for it expressly. *Cf. ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *13–15 (Del. Ch. May 16, 2012) (reforming agreements that mistakenly provided for operating member to receive promote before investing member received return of capital), *aff'd in pertinent part, rev'd on other grounds*, 68 A.3d 665 (2012).

The only reasonable reading of the International Option is that in a downside scenario where the Base Exercise Price ends up being less than the Executive's Capital Contributions, the Company need only pay the Base Exercise Price. Under this mechanic, neither side receives a windfall.

Read together, Sections 18.2 and 18.4(c) call for a determination of the Base Exercise Price. Section 18.4(c) then applies a cap such that if the Base Exercise Price would

exceed the value of the Executive's Capital Contributions, then the Executive is only entitled to receive the value of his Capital Contributions.

### b. The Possibility Of A Cause Termination

The next question is whether International Manager can exercise the International Option as if Harron had departed following a Cause Termination, as defined in the Employment Agreement. Harron maintains that the plaintiffs did not terminate him for cause, and they cannot now rely on a Cause Termination. He also contends that for the court to permit International Manager to invoke a Cause Termination would result in the court interpreting the Employment Agreement. Harron argues that the court cannot consider the Employment Agreement because it contains an arbitration provision and because the plaintiffs represented that they were not asserting any claims under it.

### i. The After-Acquired Evidence Doctrine

The answer to Harron's observation that the plaintiffs did not terminate him for cause is the after-acquired evidence doctrine. The plaintiffs argue persuasively that if they had known about Harron's outside consulting, then they would have terminated him for cause. They did not discover Harron's outside consulting until after he left, and he should not be able to benefit from concealing his misconduct.

Under the "after-acquired evidence" doctrine, an employer can "introduce evidence the employer collected after the discharged employee brings suit for wrongful discharge." *Davenport Gp. MG, L.P., Strategic Inv. P'rs, Inc.*, 685 A.2d 715, 723 (Del. Ch. 1996). The doctrine typically applies when an employer uses evidence acquired after an employee's termination to defend against a claim that it wrongfully terminated that employee. *See*

110

Stephen J. Humes, Annotation, *After-Acquired Evidence of Employee's Misconduct as Barring or Limiting Recovery in Action for Wrongful Discharge*, 34 A.L.R. 5th 699 (1995 & Supp.).

Although the parties have not cited any clear precedent, the after-acquired evidence doctrine applies all the more persuasively in this setting, where a faithless fiduciary like Harron concealed the wrongdoing that could have supported a for-cause termination. If the after-acquired evidence doctrine did not apply, then the faithless fiduciary would benefit from his wrongful acts. He would be better off for having breached his duty of loyalty by concealing his misconduct than he would have been if he had been honest and forthright.

Applying the after-acquired evidence doctrine also comports with the concept of antecedent breach, discussed previously. Harron breached the International Operating Agreement by breaching the Confidentiality Provision and violating his fiduciary duties. Because of those antecedent breaches, he is not now in an equitable position to invoke International Manager's failure to observe the requirements for exercising the International Option.

### ii. The Court's Ability To Analyze Cause

Harron next argues that this court cannot analyze whether the plaintiffs could have terminated him for cause. That issue, he says, arises under the Employment Agreement. He stresses that the Employment Agreement contains an arbitration provision, and he points out that the court denied his motion to compel arbitration in part because the plaintiffs represented that they were not asserting any claims under the Employment Agreement. Harron concludes that the court lacks jurisdiction to consider the for-cause

111

termination issue, because the parties agreed to arbitrate that point, and that the plaintiffs should be held to their earlier representations.

The short answer to Harron's concerns is that this court will not make any determinations under the Employment Agreement. This court only will make determinations under Section 18 of the International Operating Agreement. The fact that the plain language of Section 18 of the International Operating Agreement incorporates concepts and standards from the Employment Agreement does not convert an issue raised by the International Operating Agreement into an issue under the Employment Agreement.

The parties could have drafted the International Operating Agreement to replicate entirely the provisions in the Employment Agreement. Had they done so, it would have been clear that a claim under the International Operating Agreement only invoked the provisions of the International Operating Agreement. A ruling interpreting those provisions might have had implications as a matter of issue preclusion or claim preclusion for the analysis of identical provisions in the Employment Agreement, but the court only would have been interpreting the provisions of the International Operating Agreement.

In an effort to be efficient, parties do not always replicate lengthy provisions in their agreements. They instead refer to those provisions. One common scenario where parties follow that course is when they select the law of another jurisdiction to govern their LLC agreements or provide that the LLC will be governed under a different governance

regime.[42] The LLC Act permits parties to follow that route because, if the parties were willing to create an even lengthier agreement, they could write out expressly all of the provisions that they wanted to include. The drafters of the International Operating Agreement could have replicated the provisions and standards for a for-cause termination. Instead, they relied on the Employment Agreement. That reality does not transmute a ruling under the International Operating Agreement into a ruling under the Employment Agreement. A ruling under the International Operating Agreement remains a ruling under the International Operating Agreement.

Because the court is not interpreting the Employment Agreement, the court is not permitting the plaintiffs to escape their prior representations. The plaintiffs are not litigating claims or issues under the Employment Agreement. They are litigating an issue under the International Operating Agreement.

For the same reasons, the court is not running afoul of the arbitration provision. Because the court is not interpreting the Employment Agreement, the arbitration provision

---

[42] *See, e.g.*, *In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) (noting that LLC agreement provided that "the Company will be governed in all respects as if it were a corporation organized under and governed by the Delaware General Corporation Law"); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1148 (Del. Ch. 2006) (describing LLC Agreement which provided that "except to the extent any provision hereof is mandatorily required to be governed by the Delaware Limited Liability Company Act, this agreement is governed by and shall be construed in accordance with the law of the state of Texas," and commenting that it "creates an odd situation where parties to an LLC domiciled in Delaware chose to have their LLC Agreement governed by another state's law, except when the Delaware LLC Act requires the application of Delaware law," and further noting that in that case, the law of Delaware and Texas were similar on the pertinent points and citing cases from both jurisdictions).

does not apply. Regardless, the arbitration provision in the Employment Agreement contains an exception for disputes arising under Section 18 of the International Operating Agreement. It states: "If the controversy, dispute or claim has not been resolved by mutual agreement of the parties, then, except as provided by Section 18 of the [International Operating Agreement] for disagreements governed thereby, it shall be settled by submission by either party of the controversy, claim or dispute to binding arbitration . . . ." EA § 23. Disputes arising under Section 18 of the International Operating Agreement are thus carved out of the arbitration provision in any event.

For purposes of determining the exercise price under Section 18, the plaintiffs demonstrated that the Companies easily could have terminated Harron for cause.

- Section 4(b) of the Employment Agreement states that after the initial six-month window period, Harron "shall not be engaged in any other business activity, whether or not such activity is pursued for gain, profit or other pecuniary advantage unless approved by" the Nagel brothers. *Id.* § 4(b). Harron plainly breached this provision by performing outside consulting without obtaining permission.

- Section 13 of the Employment Agreement prohibits Harron from sharing "Confidential Information," defined as "information that is not generally known to the self-storage industry and that is used, developed or obtained by the Company, any subsidiary or their affiliates in connection with such person's business" and includes information concerning the "organization, finances or affairs of the Company, any subsidiary or their affiliates." *Id.* § 13(b). Harron plainly breached this provision by sending the Shared Information to Gouveia and his associates.

The plaintiffs proved that they had grounds to terminate Harron for cause and that they would have done so if they had known about his secret consulting work. International Manager therefore has grounds to exercise the International Option and pay an option price that is capped at the value of Harron's capital contributions.

114

### 3. The Procedure For Exercising The International Option

The plaintiffs argue that Metro International's equity has no value, suggesting that the court simply could permit International Manager to exercise the International Option for nothing. While it seems likely that Metro International's equity has no value, the court cannot determine that fact on this record. One of the results of this decision is that Harron must disgorge his consulting fees to the Companies. The bulk of that remedy should go to Metro International, because Metro LATAM did not come into existence until 2017. The record also reflects that Metro International has received approximately $140,000 from the dissolution of MetroFit. *See* JX 107 at 16. Metro International may receive something additional through the dissolution of MetroFit, and it also will have judgment against Harron. In light of those facts, the court cannot say that Metro International's equity has zero value.

The equitable result is for International Manager to have a new opportunity to exercise the International Option. The time for exercising the International Option will run from the final disposition of this action, and International Manager will have to comply with the terms of the International Option, *mutatis mutandis*.

### E. The Right To Repurchase Harron's Units In Metro LATAM

In a related contractual claim, the plaintiffs assert that LATAM Manager, the managing member of Metro LATAM, properly exercised its right to repurchase Harron's units. Although Harron concedes that LATAM Manager timely exercised its option, the parties dispute the amount due.

The LATAM Operating Agreement contains a provision that tracks the International Option but which applies to Metro LATAM (the "LATAM Option"). It is undisputed that LATAM Manager timely exercised the LATAM Option. *See* JX 74 at 3. In the exercise notice, Metro LATAM specified an exercise price of $86,704, which the notice represented was equal to "20% of the estimate of the total value of [Harron's] units as of the Termination Date." *Id.* To arrive at the valuation, Gallagher used methodologies that Harron himself had employed. Gallagher Tr. 329. Harron did not dispute the exercise price, and Gallagher testified persuasively that Harron viewed the exercise price as fair. *See id.* The purchase, however, did not close.

Harron now disputes the exercise price. He claims that Metro LATAM must have his units appraised, and he maintains that he is entitled to 40% of the appraised value, not 20%.

The exercise price, expressed as a percentage of appraised value, turns on the year of employment in which Harron left the Company. If Harron left "[a]fter the 5th year of [his] employment," he would be in "Year 6" and entitled to 20% of the appraised value. If Harron left after the sixth year of his employment, he would be in "Year 7" and entitled to 40% of the appraised value. The parties agreed that May 24, 2012, was the starting date for Harron's employment with Metro LATAM and that September 11, 2018, was the ending date.[43]

---

[43] In addressing this issue, the parties treated Harron's employment as beginning on May 24, 2012. But the LATAM Option states plainly that for purposes of calculating Harron's tenure under Section 18.2(c), Harron's employment began on October 10, 2012.

116

Based upon the agreed-upon starting date and ending date, Harron worked for Metro for six and one third years. Based on that temporal period, the plaintiffs argue that Harron left in "Year 6" of his employment. Harron argues he had completed his sixth year and was in "Year 7" of his employment. Under the plain language of the LATAM Option, Harron is correct.[44]

"If a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). "The intention of the parties must be determined from an examination of the whole contract and not from the separate phrases or paragraphs." *In re Viking Pump, Inc.*, 148 A.3d 633, 646 (Del. 2016) (cleaned up). "A writing is plain and clear on its face when the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation." *Bandera*, 2021 WL 5267734, at *51 (cleaned up). And "[w]hen a writing is plain and clear, the court will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *Id.* (cleaned up).

The relevant language states:

With that start date, Harron was employed for just under six years. The court has nevertheless used the parties' calculation.

[44] Like the International Operating Agreement, the LATAM Operating Agreement imposes a cap on the exercise price for a Cause Termination. For reasons that remain unclear, LATAM Manager has not invoked this provision.

After the 5th year of Executive's employment with the Employer (which began October 10, 2012), if the Executive voluntarily terminates his employment [Metro LATAM], Metro [US], or one of its affiliates shall have the option, upon the Manager's exercise of such option, to purchase all (but not less than all) of the Executive's Units by paying the following percentages of the appraised value of the Executive's Units . . . .

Year 6 – 20% of appraised value

Year 7 – 40% of appraised value

LOA § 18.2(c). Determining the meaning of the references to "Year 6" and "Year 7" requires an understanding of what "[a]fter the 5th year means."

Read in context, the phrase "[a]fter the 5th year" plainly means after the fifth year of employment is complete. That reading operates in conjunction with Section 18.4(c), which provides that if Harron voluntarily terminated his employment "within the *first 5 years* of his employment," then he is not "eligible to receive any value for his Units except for the return of his Capital Contributions." *Id.* § 18.4(c) (emphasis added). Read together, while Harron was in his fifth year of employment, he was subject to Section 18.4(c), not Section 18.2(c). Once he *completed* the fifth year of his employment and had started the sixth year of his employment, he was in "Year 6." Once he completed the sixth year of his employment and had started the seventh year of his employment, he was in "Year 7."

Based on this reading, the reference to "Year 6" means the year that begins after the fifth year of employment was complete. During Year 6, Harron would have worked five years plus some number of months for the Company. During that year, Harron was entitled to receive 20% of the appraised value of his units. The reference to "Year 7" means the year that begins after the sixth year of employment was complete. During that year, Harron

118

would have worked six years plus some number of months for the Company. Harron was entitled to receive 40% of the appraised value of his units.

When Harron terminated his positions at Metro US and the Companies, he had completed six years and three months of employment. Harron therefore was in "Year 7" of his employment. He had not completed his seventh year, but he was plainly in it. He accordingly was entitled to 40% of the appraised value of his units.

Harron also contends that the parties failed to agree on a fair market value for the units within sixty days, such that an appraiser must value the units. As noted, Gallagher testified persuasively that Harron agreed on the value in the notice. Harron cannot now retract his agreement. Harron agreed that $86,704 was the proper exercise price based on 20% of fair market value. It follows that $173,408 is the proper exercise price based on 40% of fair market value.

The final judgment will direct Harron to transfer his units in Metro LATAM in return for the payment of $173,408 from LATAM Manager.

## F.      The Stored Communications Act

In their final claim, the plaintiffs assert that Harron violated the Stored Communications Act. The Stored Communications Act is violated whenever a person

> (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or
>
> (2) intentionally exceeds an authorization to access that facility;
>
> and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system . . . .

119

18 U.S.C. § 2701(a). The plaintiffs argue that Harron violated the Stored Communications Act by (1) removing confidential information from Metro US's network, (2) deleting emails from the Metro US email server on or after his last day of employment, and (3) continuing to access his Dropbox account. POB at 47, 50, 51. Harron responds that the plaintiffs lack standing to assert this claim and cannot prove a violation. DOB at 54–55.

### 1. Standing

In a civil action, the Stored Communications Act grants standing to "any provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter." 18 U.S.C. § 2707(a). The parties debate each of the three categories. The court need not address the first or third, because the Companies clearly were "subscriber[s] . . . aggrieved by any violation of this chapter."

When interpreting a federal statute, "[t]he role of the courts . . . is to give effect to Congress's intent." *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001). Courts "assume that Congress expresses its intent through the ordinary meaning of its language and therefore begin with an examination of the plain language of the statute." *Disabled in Action of Pa. v. SE Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) (cleaned up). "Where the statutory language is plain and unambiguous, further inquiry is not required." *Rosenberg*, 274 F.3d at 141. Where statutory terms are undefined, courts "look to dictionary definitions to determine the ordinary meaning of a word with reference to its statutory text." *United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021) (cleaned up).

Merriam-Webster's defines "subscribe" as "to receive or have access to something (such as a periodical or service) as part of an arrangement to receive a certain number of

120

regular deliveries or a certain period of continuous access especially by prepayment."[45] Thus, a "subscriber" is one who "receive[s] or ha[s] access to something . . . as part of an arrangement. . . ." *See Merriam-Webster*, *supra*, *Subscribe*.

The term "subscriber" defines precisely the relationship between the Companies and Metro US under the Services Agreement. Metro US provided access to its network; the Companies' subscribed to its network. The Companies accordingly have standing to sue under the Stored Communications Act.

## 2. Whether Harron Violated The Stored Communications Act

The next question is whether Harron violated the Stored Communications Act. To reiterate, a person may violate the Stored Communications Act by accessing an electronic communication while it was in storage by either intentionally accessing the system without authorization or by exceeding the person's authorization. *See* 18 U.S.C. § 2701. The plaintiffs do not argue that Harron exceeded his authority, only that he accessed the system after he no longer had any authority to do so.

The Stored Communications Act comes into play when a person accesses a "facility." A majority of courts have concluded that the relevant facility is not the computer that enables the use of an electronic communication service, but instead the facilities

---

[45]     *Subscriber*,     Merriam-Webster     Dictionary,     https://www.merriam-webster.com/dictionary/subscriber; *accord Subscriber*, Oxford's Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/definition/english/subscriber?q=subscriber ("[A] person who pays to receive a service[.]").

operated by the provider of electronic communication services and that is used to provide or maintain electronic storage.[46] Accordingly, it is not enough that Harron used his company-issued computer after his last day of employment. To violate the Stored Communications Act, Harron needed to access the network after his last day of employment.

The plaintiffs argue that Harron violated the Stored Communications Act by inserting the third USB drive after his last day of employment and downloading documents from the network. This decision has found Harron used the third flash drive in a manner similar to the first two flash drives. The plaintiffs thus proved by a preponderance of the evidence that Harron accessed the network to download files to all three USB drives. *See* JX 110 at 8 ("The timing of the network file access coincides to some extent with the insertion of the USB drives.").

The plaintiffs' other theories do not succeed. The plaintiffs contend that Harron violated the Stored Communications Act by deleting emails from the Metro US email server after his last day of employment.[47] The record indicates that Harron deleted a

---

[46] *See Freedom Banc Mortg. Servs., Inc. v. O'Hara*, 2012 WL 3862209, at *9 (S.D. Ohio Sept. 5, 2012); *see also In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 146 (3d Cir. 2015) (agreeing with the district court that "an individual's personal computing device is not a facility through which an electronic communications service is provided" (cleaned up)); 4 E-Comm. & Internet L., ch. 44.07 n.5, Westlaw (database updated Apr. 2020) (collecting cases).

[47] Plaintiffs are incorrect in basing their claim on Harris deleting emails "on or after" his last day of employment. Any emails deleted on Harron's last day of employment could

staggering number of Spire-related emails from his Metro-related email account. *See* JX 123 ¶ 7; *id.* Ex. A. The forensic evidence also establishes that Harron received nine emails on September 11, 2018, and subsequently deleted those emails. *Id.* Ex. A at 49. It is impossible to know when Harron deleted those emails because Outlook does not track the date an email is deleted. Glud Tr. 371–72. Harron could have deleted the emails on September 11, or Harron could have deleted the emails at some point after September 11. In the former case, Harron would not have violated the Stored Communications Act because he was still authorized to access the network. In the latter case, Harron would have violated the Stored Communications Act because he was not authorized to access the network after his employment terminated.

The plaintiffs argue that Harron's use of the third USB drive, and his deletion of eleven documents on September 13, 2018, provides sufficient circumstantial evidence to support a finding that Harron also deleted emails that day. That contention is not persuasive. None of the eleven documents deleted on September 13, 2018, were attachments to emails sent September 11, 2018. Had they been, then that fact would have provided strong evidence that Harron deleted the emails after September 11. Instead, there is only an absence of evidence.

The plaintiffs failed to prove that Harron deleted emails after September 11, 2018. This decision therefore does not need to address the parties' disagreement about whether

---

not subject Harron to liability under the Stored Communications Act because Harron was still authorized to access the network on that date.

Harron's failure to "permanently" delete the emails renders the Stored Communications Act inapplicable.

The plaintiffs also fall short in claiming that Harron violated the Stored Communications Act when his Dell computer synced with his Dropbox account. The evidence establishes that the Dropbox account was a personal account, not a corporate account. Glud Tr. 387. Harron therefore did not access a corporate account without authorization.

### 3. Damages Under The Stored Communications Act

Because the plaintiffs proved that Harron violated the Stored Communications Act when he used the third USB drive after his last day of employment, this decision must determine whether the plaintiffs are entitled to a remedy. In a civil action under the Stored Communications Act, the "court may assess as damages . . . the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000." 18 U.S.C. § 2707(c). Further, "[i]f the violation is willful or intentional, the court may assess punitive damages." *Id.*

Absent a statutory grant of authorization, the Delaware Court of Chancery does not have jurisdiction to assess punitive damages. *See Beals v. Wash. Int'l, Inc.*, 386 A.2d 1156, 1159 (Del. Ch. 1978) ("I therefore hold that Chancery historically and traditionally did not enforce forfeitures or penalties and that this was the rule of law in the high court of chancery in England in 1776 and is therefore the rule in this Court today."). When a statute grants the court the power to award punitive or exemplary damages, then the Court of

Chancery can exercise that authority. *See, e.g.*, *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *28 & n.318 (Del. Ch. Jan. 29, 2010) (awarding exemplary damages where authorized by the Delaware Uniform Trade Secret Act). In this case, Harron's violation was not sufficiently serious to warrant an award of punitive damages. The plaintiffs also have not proved actual damages.

This leaves statutory damages. The statute unequivocally states that "*in no case* shall a person entitled to recover *receive less* than the sum of $1,000." 18 U.S.C. § 2707(c) (emphasis added). Under the majority rule, a plaintiff can recover statutory damages without proving actual damages. *See* Claudia G. Catalano, Annotation, *Unlawful Access to Stored Communications Pursuant to Stored Communications Act, 18 U.S.C.A. §§ 2701 et seq.*, 1 A.L.R. Fed. 3d Art. 1 § 71 (2015) (collecting cases). That outcome applies the plain meaning of the statute, which states that a person "entitled to recover" is one who (1) has standing and (2) has proved the defendant violated the statute. *See* 18 U.S.C. § 2707(a) ("[A]ny . . . subscriber . . . may, in a civil action, recover from the person or entity . . . which engaged in t[he] violation . . . ."); *Brooks Gp. & Assocs., Inc. v. LeVigne*, 2014 WL 1490529, at *10 (E.D. Pa. Apr. 15, 2014) ("This interpretation is in line with the clear weight of authority . . . . [T]his Court agrees with most other courts to consider the question and holds that [plaintiff] need not allege actual damages . . . ."). Plaintiffs are therefore entitled to recover the statutory minimum of $1,000, regardless of whether they suffered actual damages.

When assessing statutory damages, courts agree that a prevailing plaintiff may recover $1,000 for each time the Stored Communications Act is violated, with the violation

125

measured by the number of times that the defendant accesses the electronic communications facility, rather than based on the number of documents that the defendant examines or downloads while accessing the facility.[48] Harron only violated the Stored Communications Act once, when he downloaded documents to the third USB drive on September 13, 2018. Because he only committed one violation—a single and continuous unauthorized access—the plaintiffs are entitled to the statutory minimum of $1,000. *See* JX 109 at 7 (providing that the third USB drive was inserted into the Surface for a single roughly seventy-five-minute period on September 13, 2018).

When a plaintiff has prevailed on a Stored Communications Act claim, the statute permits the court to "assess the costs of the action, together with reasonable attorney fees

---

[48] *See, e.g.*, *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 759 F. Supp. 2d 417, 428 (S.D.N.Y. 2010) ("Clearly, each accessed email cannot constitute a separate violation of the Act, as the [Stored Communications Act] specifically targets the unauthorized access of an electronic communication facility."); *Konop v. Hawaiian Airlines*, 411 B.R. 678, 683 (D. Haw. 2009) (assessing $9,000 in damages, representing $1,000 for each of the nine instances in which defendant violated the Stored Communications Act), *summarily aff'd*, 401 Fed. App'x 242 (9th Cir. 2010); *In re Hawaiian Airlines, Inc.*, 355 B.R. 225, 232 (D. Haw. 2006) (observing that if an individual accessed without authorization a network "several times in short succession, it might be appropriate to aggregate those intrusions if they functionally constituted a single visit to the website," but if violations "were significantly separated in time and accessed different information would clearly constitute separate violations of the Act entitled to separate damages awards"); *United Lab'ys, Inc. v. Rukin*, 1999 WL 608712, at *5 (N.D. Ill. Aug. 4, 1999) (assessing compensatory damages of $200,000, which represented $1,000 multiplied by each of the defendant's 200 violations; defendant accessed without authorization a "voicemail system virtually every day for a period of at least five months"); *see also Sood v. Rampersaud*, 2013 WL 1681261, at *3 (S.D.N.Y. Apr. 17, 2013) ("But accessing numerous emails at different moments during a single continuous intrusion may still qualify as a single violation based on the particular circumstances of the intrusion.").

determined by the court." 18 U.S.C. § 2707(c). The court will exercise its discretion and award the plaintiffs their attorneys' fees incurred in litigating their successful Stored Communications Act claim. This amount is distinct from the partial award of attorneys' fees awarded as a remedy for Harron's misuse of confidential information. In calculating the attorneys' fees plaintiffs are entitled to because of Harron's fiduciary breach, the plaintiffs should not include any amount expended in pursuing their Stored Communications Act claim. Plaintiffs' counsel shall make a fee application, supported by a Rule 88 affidavit, so that the amount can be quantified and included in the final judgment.

### III.    CONCLUSION

The court will enter a final judgment awarding the plaintiffs the following relief:

- Harron is liable to the Companies for $515,151, representing the disgorgement of Harron's fees earned through his outside consulting;

- The Companies are entitled to the fees and expense incurred litigating the breach of fiduciary duty claim.

- The Companies are entitled to a mandatory injunction requiring Harron to return all of the Companies' confidential information.

- The Note is immediately due and payable.

- International Manager may exercise the International Option.

- The parties shall complete the exercise of the LATAM Option at an exercise price of $173,408.

- Harron is liable to the plaintiffs for $1,000 for violating the Stored Communications Act and must pay the plaintiffs for the fees incurred in litigating that claim.

Within thirty days, the parties will submit a joint letter that identifies a schedule for resolving any disputes over the amount of attorneys' fees and expenses that are due. The

127

letter shall identify any other issues that must be addressed before a final judgment can be entered and propose a schedule for resolving them.